IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| LELAND BOOTHE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | C.A. NO. C-06-221 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| Respondent. | § | |

**MEMORANDUM AND RECOMMENDATION
ON RESPONDENT'S MOTION FOR SUMMARY JUDGMENT**

Petitioner is an inmate in the Texas Department of Criminal Justice,

Criminal Institutions Division ("TDCJ-CID"), and currently is incarcerated at the

Skyview Unit in Rusk, Texas.  Proceeding pro se, petitioner filed this habeas

corpus petition pursuant to 28 U.S.C. § 2254.  (D.E. 1).  Pending is respondent's

motion for summary judgment.  (D.E. 76).  For the reasons stated herein, it is

respectfully recommended that respondent's motion for summary judgment be

denied and that an evidentiary hearing be held.

**I.  JURISDICTION**

The Court has jurisdiction over the subject matter and the parties pursuant to

28 U.S.C. §§ 2241, 2254, which provide that jurisdiction is proper where the

inmate is confined, or where the conviction was obtained.  Wadsworth v. Johnson,

235 F.3d 959, 961-62 (5th Cir. 2000).  Petitioner was convicted by the 347th

Judicial District Court of Nueces County, Texas, and therefore, jurisdiction is proper in this Court.

## II.  BACKGROUND

**A.    Petitioner's Conviction and Incarceration.**

Petitioner is currently serving a fifty-year sentence for first degree murder. (D.E. 12-2, at 27) (State v. Boothe, 96-CR-1563-H at *1).  The day after the murder, he overdosed on heroin and cocaine in an attempt to commit suicide. (D.E. 12-5, at 14).  Following treatment for the overdose, he voluntarily checked himself into Southside Health Center's Department of Behavioral Medicine for treatment and evaluation.  Id.  He told the doctor that he had been suffering from mental health problems since he was nine years old.  Id.  While he was at Southside Health Center, Sergeant R.B. Maxwell interviewed him, and, after being warned of his Miranda rights, he confessed to the murder.  (D.E. 12-4, at 2).

Pursuant to a plea agreement, he pleaded guilty and was incarcerated in 1996.  (D.E. 12-2, at 28) (Boothe at *2).  He now claims that he did not voluntarily plead guilty because he did not understand the nature of the charge against him, or the consequences of his plea.  (D.E. 1, at 1-2).  He complains that he did not receive adequate oral admonishments regarding the charge against him.  Id. at 11. Petitioner signed written admonishments, and both he and his attorney represented

that he understood the admonishments and the consequences of signing them.

(D.E. 12-2, at 39) (Boothe, "Acknowledgment by Defendant").  Petitioner claims

he was mentally incompetent and therefore did not understand what he was

signing.  (D.E. 1, at 16).  He also alleges that a court reporter should have been

present at the proceedings, but was not.  Id. at 4.  Petitioner further complains of

ineffective assistance by his court-appointed counsel.   Id. at 2-5.  He asserts that

his counsel told him an insanity defense was "not viable."  Id. at 5.  Finally, he

claims that his counsel coerced him into pleading guilty.  Id. at 2-3.

**B.     Procedural History.**

Petitioner filed an application for a state writ of habeas corpus on September

30, 2005.  Ex Parte Boothe, App. No. 63, 262-01 at 2.  On March 1, 2006, the

Texas Court of Criminal Appeals denied his state habeas petition without written

order.  Id.  He filed a federal petition for habeas corpus with this Court on April 14,

2006.  (D.E. 1, at 8).

On July 31, 2006, respondent filed a motion to dismiss the petition as time

barred by § 2244 of the Antiterrorism and Effective Death Penalty Act

("AEDPA").  (D.E. 17).  On August 17, 2006, petitioner responded to that motion.

(D.E. 20).  In his response, he stated that he was incompetent during the nine years

he spent at the Jester IV Unit, and therefore, his petition was not time barred.  (D.E.

20, at 3-4).  On September 5, 2006, petitioner filed a motion requesting an interlocutory appeal to challenge the respondent's filing of a motion to dismiss in lieu of an answer.  (D.E. 22).  On September 21, 2006, petitioner filed a motion for default judgment, in which he asserted that respondent defaulted by filing a motion to dismiss in lieu of an answer.  (D.E. 24).

On January 5, 2007, petitioner was appointed counsel to conduct discovery in connection with petitioner's claim for equitable tolling of the AEDPA's limitations period.  (D.E. 52).  On February 7, 2007, the Court issued an order denying the parties' pending motions without prejudice until further discovery could be completed.  (D.E. 58).  Respondent filed a motion for summary judgment, (D.E. 76), after submitting petitioner's medical and TDCJ-CID administrative records.  (D.E. 12, 41, 44, 71, 73).  Petitioner responded on June 11, 2007.  (D.E. 79).  Both parties have submitted affidavits and documentary exhibits in support of their respective positions.  (D.E. 76, 79).

## C.   Factual History.

Petitioner claims that the AEDPA's statute of limitations should be equitably tolled because he lacked the mental capacity to file a habeas petition until 2005. (D.E. 20, 79).  Respondent does not dispute petitioner's mental incapacity from the date of his incarceration through 2003, or from 2004 through the time petitioner

filed his state habeas application in 2005.  Instead, respondent asserts "that at a bare minimum," petitioner was competent during 2003.  (D.E. 76, at 7).

On May 6, 1996, petitioner murdered Kathleen Maloney.  (D.E. 12-3, at 2). That same day, he voluntarily admitted himself to Southside Health Center for psychiatric treatment.  Id. at 32.  He confessed to police ten days after the murder. (D.E. 12-4, at 13).  Police arrested him at the hospital on May 17, 1996, with the condition that his treating physician, Dr. Nestor Praderio, could treat him at the county jail.  (D.E. 12-3, at 33).

### 1.      Petitioner's Mental History Prior to Incarceration at TDCJ-CID.

On August 7, 1996, Judge Joaquin Villarreal of the 347th Judicial District Court of Nueces County, Texas ordered a psychiatric examination of petitioner to determine his competency to stand trial.  (D.E. 12-4, at 24).  Dr. Raul Capitaine, who examined him, found that he was competent to stand trial, and that he did "have sufficient ability to consult with his attorney with a reasonable degree of understanding" and "ha[d] a rational or factual understanding of the proceedings that [we]re pending against him."  Id. at 25.  In addition, Dr. Capitaine concluded that although petitioner had a diagnosis of schizoaffective disorder and polysubstance abuse, "the symptoms of his mental illness were not prominent at the time Kathleen Maloney was murdered," that "on the day of the murder Mr.

Boothe knew right from wrong," and that petitioner had been compliant with

prescribed medications and treatment as evidenced by the fact that his symptoms

were in remission.  Id.

Dr. Capitaine's report includes the following personal history, given by

petitioner at the time of his pre-trial psychiatric evaluation:

> Mr. Boothe said that his first contact with a psychiatrist
> occurred when he was nine years old.  He explained that
> he had run away from his adoptive mother because she
> was beating him.  After the police picked him up, the
> judge ordered the family to go to MHMR [Texas Mental
> Health Mental Retardation].  Mr. Boothe said that he had
> been hospitalized for psychiatric treatment at least 15
> times, usually after a suicide attempt....
>
> Mr. Boothe was born in San Angelo, Texas to Margaret
> and L.C. Chowning.  He said that his father was an
> alcoholic and when he was 5 years old, his mother could
> no longer take care of him and his four brothers, so she
> took them to the Lubbock Children's Home and
> terminated her parental rights.  He was adopted by the
> Boothe's [sic] when he was 7 years old.  He lived with
> them until he was 14.  They placed him in Hope Haven
> and he spent time in foster home placements.  Mr. Boothe
> said that when he was 17 years old, he joined the Navy.
> Mr. Boothe has been married three times and has four
> children.  His last divorce occurred in 1989.  He has no
> contact with any of them.
>
> Mr. Boothe left school in the 9th grade.  He earned a
> GED when he was in the military.  He said that he has
> earned college hours from Texas A&M.  He has several
> technical licenses and has worked in construction, air-
> conditioning/heating and as a maintenance man.  He said

6

that he has never held a job for more than 9 months. However, he said that he has never been fired; he just quits when he gets bored.  Mr. Boothe explained that he had been placed in his last job at the Port Avenue Apartments, where Kathleen Maloney was a resident manager, by a homeless veteran's program sponsored by the Salvation Army.  He had been sent to that program by the alcohol rehabilitation program at the Veteran's Hospital in Kerrville in June, 1995.

...

Mr. Boothe said he started smoking pot when he was 10 years old.  His uncle grew it out behind the hen house. He started using alcohol when he was 19.  Mr. Boothe said that he had stayed stoned all his life.  He started using cocaine in 1981.  He had achieved three years of sobriety until last April [of 1996].  He said that he started hanging around with some kids that were also working at the apartment complex.  He first he started [sic] smoking a little pot and then he joined them when they were smoking crack.  He said that once he started, he could not stop.

Mr. Boothe said he was arrested for the first time when he was about 25 years old.  He had been in jail three times prior to his arrest, each time charged with a theft. He said that he has never committed a violent crime before he killed Kathleen Mahoney [sic].

Id. at 26-27.

Dr. Capitaine's report summarizes the medical reports on petitioner's condition, made shortly after the murder, as follows:

According to records from [Southside] hospital, he has an Axis I diagnosis of schizoaffective disorder, depressed

7

type.  Dr. Cecil Childers admitted Mr. Boothe to Southside on May 7, 1996.  He reported that Mr. Boothe was a "profoundly depressed appearing, hallucinating male, oriented to time, place, person and situation.  Hears voices.  'I am not going to talk about what they said' [sic] Intellectually denies being followed, watched, recorded.  Admits to thought insertion, thought stealing, thought broadcasting.  Admits to forced behavior control, but denies there are thoughts coming out of the TV set."  On May 9th, he was seen by Dr. Nestor Praderio who wrote that "pt presented disoriented, confused and disorganized.  Continue with Sx's of psychosis, e.g. delusions of persecutory and somatic type, auditory and visual hallucinations and thought broadcasting as well as insertion."  His assessment was a clinical presentation of acute psychotic episode, in need of medication adjustment and management and a therapeutic milieu offering structured care.  Dr. Praderio continues to manage Mr. Boothe's medication while he is incarcerated.  At this time his prescriptions include: Dyserel [sic], 150 mg, H.S.;[1] Risperdal, 2 mg, B.I.D.;[2]

---

[1] "Desyrel" is the trademark name for a compound of trazodone hydrochloride made by Bristol-Meyers Squibb Company.  Desyrel Prescribing Information, http://www.bms.com/cgi-bin/anybin.pl?sql=PI_SEQ=48, at 1.  Trazodone hydrochloride is "an antidepressant used to treat major depressive episodes with or without prominent anxiety."  Dorland's Illustrated Medical Dictionary 1868 (29th ed. 2000) [hereinafter Dorland's].  Noted adverse events connected to treatment with Desyrel include anger/hostility/confusion, decreased concentration, disorientation, dizziness/lightheadedness, drowsiness, excitement, fatigue, headache, insomnia, impaired memory, and nervousness.  See Desyrel Prescribing Information, supra at 4-8.

[2] "Risperdal" is the trademark name for risperidone.  Physician's Desk Reference 1676 (61st ed. 2007) [hereinafter PDR].  Risperidone is "a benzisoxazole derivative used as an antipsychotic agent."  Dorland's, supra n.1, at 1581.  Noted adverse events connected to treatment with Risperdal include insomnia, agitation, anxiety, somnolence, and aggressive reaction.  PDR at 1679.

Cogentin 2 mg, B.I.D.;[3] and Xanax, 1 mg, B.I.D.[4]

Id. at 27.

### 2.    Petitioner's Mental History At TDCJ-CID Prior To 2003.

When petitioner was first convicted and assigned to TDCJ's custody, he

was not placed in a psychiatric unit, but instead was given work assignments.

Misc. Admin. Records at 33.[5]  However, by February 1997, his status was recorded

as "Job Assignment - Unassigned-Mental (Pysch)," and he was placed in the Jester

IV Unit, a psychiatric unit within TDCJ-CID.  Id.  Petitioner was suffering from

"depressive and psychotic symptoms with auditory hallucinations and acute

_____

[3] "Cogentin" is the trademark name for a compound of benztropine mesylate made by Merck & Co., Inc.  Cogentin Prescribing Information, http://www.merck.com/product/usa/pi_circulars/c/cogentin/cogentin_pi.pdf, at 1.  Benztropine mesylate is "a synthetic compound combining the active moieties of atropine and diphenylhydramine, and having anticholinergic, antihistaminic, and local anesthetic effects, used as an antidyskinetic in the treatment of parkinsonism and for the control of extrapyramidal reactions (except tardive dyskinesia) to neuroleptic drugs."  Dorland's, supra n.1, at 205.  The manufacturer warns that adverse reactions that have occurred following the administration of Cogentin include "toxic psychosis, including confusion, disorientation, memory impairment, visual hallucinations; exacerbation of pre-existing psychotic symptoms; nervousness; depression; listlessness; numbness of fingers."  Cogentin Prescribing Information, supra at 3.

[4] "Xanax" is the trademark name for alprazolam tablets made by Pfizer, Inc.  Xanax Prescribing Information, http://www.pfizer.com/pfizer/download/uspi_xanax.pdf, at 1.  Alprazolam is "a benzodiazepine used as an anxiolytic in the treatment of anxiety disorders and panic disorders and for short-term relief of anxiety symptoms."  Dorland's, supra n.1, at 54.  The manufacturer warns that adverse events reported in trials of Xanax include drowsiness, light-headedness, depression, headache, confusion, insomnia, nervousness, syncope, dizziness, and akathisia.  Xanax Prescribing Information, supra at 14-15.

[5] "Miscellaneous Administrative Records" will be designated as "MAR" with the page number following the designation.

9

agitation."  Additional Boothe Medical Record at 28.[6]

A psychiatric evaluation completed by Dr. Richard Orr on February 6, 1997

noted petitioner's ongoing psychological struggles:

> The patient said he had been thinking about suicide since
> 12-96.  He discontinued his medications 5 days ago
> because they just weren't working.  They were supposed
> to stop him from thinking of suicide but he was also
> experiencing serious pessimism as well as depression.
> During the 2-3 months that he was thinking about
> suicide, the following 3 methods considered were: 1)
> starving himself to death.  (He didn't eat for 10 days.)  2)
> Cut himself with a razorblade.  (He went only so far as to
> extract the blade from his razor.)  3) To hang himself.
> (He said he took and braided an 8 foot 3-string rope that
> he believed was strong enough to suspend him by the
> neck until death.  But then he said he told a guard that he
> was thinking about it because when he was asked why
> did he tell the guard.  He said, "Because I have a thinking
> problem."  The patient has been on numerous
> antidepressant regimes throughout his psychiatric career
> including the following that have not been effective:
> SSRIs: Zoloft,[7] Doxepin,[8] Amitriptyline,[9]

---

[6] "Additional Boothe Medical Record" will be designated as "ABMR" with the page number following the designation.

[7] "Zoloft" is the trademark name for a compound of sertraline hydrochloride.  PDR, supra n.2, at 2586.  "Sertraline hydrochloride" is "a selective serotonin reuptake inhibitor used as an antidepressant."  Dorland's, supra n.1, at 1629.  Commonly reported adverse reactions include somnolence, tremor, dizziness, agitation and insomnia.  PDR at 2591.

[8] "Doxepin hydrochloride" is "a tricyclic antidepressant of the dibenzoxepine class, also having significant anxiolytic activity."  Dorland's, supra n.1, at 542.

[9] "Amitriptyline hydrochloride" is a "tricyclic antidepressant of the dibenzocycloheptadiene group, also having sedative effects."  Dorland's, supra n.1, at 63.

Clomipramine,[10] and Trazodone;[11] no epinephrine
reuptake inhibitors; Desipramine,[12] combination of SSI
and any Imipramine;[13] miscellaneous, Resperidol [sic],[14]
Thorazine,[15] Mellaril,[16] Haldol,[17] Navane,[18] and Lithium
Carbonate.[19]  The patient reported that the only

---

[10] "Clomipramine hydrochloride" is "a tricyclic antidepressant of the dibenzazepine class, also having anxiolytic activity."  Dorland's, supra n.1, at 365.

[11] See supra n.1.

[12] "Desipramine hydrochloride" is "a tricyclic antidepressant of the dibenzazepine class; used also in the treatment of anxiety."  Dorland's, supra n.1, at 483.

[13] "Imipramine" is "a tricyclic antidepressant of the dibenzazepine class."  Dorland's, supra n.1, at 878.

[14] See supra n.2.

[15] "Thorazine" is the trademark name "for preparations of chlorpromazine."  Dorland's, supra n.1, at 1834.  Chlorpromazine is "used as an antiemetic and tranquilizer."  Id. at 338.

[16] "Mellaril" is the trademark name for a compound of thioridazine hydrochloride manufactured by Novartis.  Dorland's, supra n.1, at 1077.  Thioridazine hydrochloride is "a phenothiazine compound having antipsychotic and sedative effects, used in the treatment of schizophrenia and acute psychotic episodes, for the relief of anxiety, agitation and depression in mood disorders."  Id. at 1833.  Among the side effects that have been reported in connection with thioridazine hydrochloride are severe drowsiness, nocturnal confusion, hyperactivity, psychotic reactions, and even behavioral effects suggestive of a paradoxical reaction, including bizarre dreams, excitement, aggravation of psychoses, and toxic confusional states.  PDR, supra n.2, at 2164-65.

[17] "Haldol" is the trademark name "for preparations of haloperidol."  Dorland's, supra n.1, at 782.  Haloperidol is "an antipsychotic agent of the butyrophenone group, which also has antiemetic, hypotensive, and hypothermic actions; used especially in the management of psychoses...."  Id. at 784.

[18] "Navane" is the trademark name "for preparations of thiothixene."  Dorland's, supra n.1, at 1179.  Thiothixene is "used for the treatment of psychotic disorders."  Id. at 1833.

[19] "Lithium carbonate" is "a lithium salt used in the treatment of acute manic states and in the prophylaxis of recurrent affective disorders manifested by depression or mania only, or those in which both mania and depression occur occasionally."  Dorland's, supra n.1, at 1019.  The occurrence and severity of adverse reactions associated with lithium carbonate increase with

antidepressant regime that he felt was really effective was Prozac and he also said there was a combination of Resperidol, Cogentin, and Xanax that he thought was helpful.

...

DSM-IV DIAGNOSIS:[20]

Axis I:          296.33 Major Recurrent Depression, severe.
                 R/O 296.34 Major Recurrent Depression
                 with psychotic features *(somewhat doubtful*
                 *if these are really features that would*
                 *respond to neuroleptics).*
                 R/O 296.7 Mood Disorder NOS.
                 R/O 296.5x Bipolar I Disorder, mixed type,
                 unknown severity.
                 R/O 296.89 Bipolar II Disorder.

---

dosage, but tend to subside with continued treatment.  PDR, supra n.2, at 1693.  Commonly associated adverse reactions vary, but include drowsiness, muscle weakness, lack of coordination, hypertonicity, blackout spells, seizures, slurred speech, dizziness, vertigo, restlessness, confusion, stupor, coma, hallucinations, poor memory, slowed intellectual functioning, startled response, and worsening of organic brain syndromes.  Id.

[20] The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, "DSM-IV-TR" explains that:

[a] multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome.  There are five axes included in the DSM-IV multiaxial classification:

| | |
|---|---|
| Axis I | Clinical Disorders |
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders |
| | Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychosocial and Environmental Problems |
| Axis V | Global Assessment of Functioning. |

Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed. 2000) [hereinafter DSM-IV-TR].

> 303.93 and 304.8 Alcohol Dependence and
> Polysubstance Dependence.
> All these dependencies in remission without
> recovery.

| | |
|---|---|
| Axis II: | 301.70 ASPD. |
| Axis III: | H/o angina; H/o multiple allergies not yet identified. |
| Axis IV: | 4. |
| Axis V: | 35 +/-5.[21] |

Final Boothe Medical Record Supplement at 260-61.

By the next week, petitioner was awaiting a bed in "acute care."  ABMR at

3.  On February 11, 1997, petitioner was discharged to "Acute Care II" with the

following DSM-IV Diagnosis:

> Axis I:    296.33 Major Recurrent Depression.  (As
> noted previously, he's on multiple
> antidepressants and his experience was that
> he responded best to Prozac).[22]
> 304.8 and 303.93 Polysubstance and
> Alcohol Dependence in remission without

---

[21] A GAF score is a clinical assessment of an individual's level of psychological, social, and occupational functioning.  DSM-IV-TR at 32.  A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  Id. at 34.

[22] "Prozac" is the trademark name for a compound of fluoxetine hydrochloride.  PDR, supra n.2, at 1801.  Fluoxetine hydrochloride is "a selective serotonin uptake inhibitor used in the treatment of depression, obsessive-compulsive disorder, and bulimia nervosa."  Dorland's, supra n.1, at 689.  The manufacturer warns that the adverse reactions most commonly associated with Prozac in clinical trials include insomnia, anxiety, nervousness, somnolence, and tremor. Prozac Prescribing Information, http://pi.lilly.com/us/prozac.pdf, at 21-23.

recovery.
Axis II:      301.70. [Antisocial Personality Disorder]
Axis III:     H/o angina; URI (being treated
              symptomatically with Dimetapp tabs 1 bid x
              3 days).
Axis IV:      4.
Axis V:       35 +/-5.
Again, he'll be treated with Prozac 20 mg daily and again
the Treatment Team feels that he will respond to a SSRI
without any neuroleptics.

ABMR at 4; DSM-IV-TR at 862.  Records indicate that throughout early February

1997, petitioner was suicidal, spent most of his time lying quietly on his bunk, and

requested medication.  ABMR at 3-9.  He was also being closely observed because

he had attempted to hang himself.  Id. at 10-19.  He was taking Mellaril during this

period.  Id. at 237.

On March 18, 1997, petitioner was referred to Jester IV Unit Crisis

Management.  FBMRS at 287.  At that time, his GAF was noted as 24.[23]  Id. at 288.

A treating physician noted that "[i]t is not known at this time whether he will

benefit from continued inpatient treatment beyond the acute phase of his illness."

Id. at 289.

In March of 1998, following a psychiatric evaluation, petitioner's prognosis

---

[23]A GAF of 21-30 indicates that "[b]ehavior is considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent,
acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas
(e.g., stays in bed all day; no job, home or friends)."  DSM-IV-TR at 34.

was "Guarded."  FBMRS at 302.  His DSM-IV Axial Diagnosis was recorded as

follows:

| | |
|---|---|
| Axis I: | 296.3 Major Recurrent Depression, severe, recurrent; 303.93 and 304.8 Alcohol Dependence and Polysubstance Dependence (these dependencies in remission without recovery) |
| Axis II: | 301.7 ASPD |
| Axis III: | History of angina; History of multiple allergies not yet identified |
| Axis IV: | 4 |
| Axis V: | GAF last year approximately 38 |
| On admission 30 | |
| At present 36. | |

Id. at 302.  In June and July 1998, it was noted that he continued to suffer from

Major Depressive Disorder with psychotic features.  Id. at 307-08.  Throughout

1998 he continued in "extended care."  Id. at 307-09.  No other records are

available for 1998.

In February 1999, petitioner underwent another psychiatric evaluation.

ABMR at 533.  At that time, the physician noted "a mild degree of psychomotor

retardation.  His speech is reduced as to volume, amount, and speed."  Id.  The

physician also noted that "[h]is insight is lacking; judgment impaired.  The patient

does not have the intellectual nor the emotional awareness to foresee

consequences."  Id. at 534.  At that time, he was not suffering from auditory or

visual hallucinations.  Id.  His functioning level was "low," and he needed

15

"continued inpatient psychiatric treatment at the Extended Care level."  Id.  His GAF was recorded at 35.  No other records are available for 1999.

In March 2000, petitioner was still taking many of the same medications, including Lithium, Risperidone, Benadryl, and Doxepin.  Id. at 75, 198-204.  A psychiatric evaluation dated April 14, 2000 indicates that petitioner was "feeling more depressed with suicidal ideations with plan but not intent, increased mood swings and decreased sleep and eating."  ABMR at 527.  The physician recorded that his insight and judgment were fair, that his fund of information and intelligence were average, and that his thought process was goal directed.  Id. at 529.  At that time, he suffered from auditory hallucinations and "suicidal ideations with plan of electrocution by dismantling the electric outlet."  Id.  His GAF was listed as 40.  The examining physician recommended that he stay in the "Chronic Psychotic Disorder Program of Jester IV for maintaining his ADL's due to the chronicity and the severity of his psychotic symptoms and his personality disorder."  Id. at 530 (emphasis added).  He also suffered from a hand, leg, and low lip tremor during his evaluation.  FBMRS at 34.

In October 2000, Jester IV Unit staff began to keep records of petitioner's participation in group therapy sessions.  FBMRS at 39.  On October 3, 2000, he made one response to a comment made, was clean and normally dressed, and was

cooperative overall during group therapy.  Id.  On October 4, 2000, he talked about

his suicidal tendencies and the coping skills he was trying to develop.  Id. at 40.

No other group therapy records from 2000 are included in the record before this

Court.

A psychiatric evaluation report dated February 27, 2001 revealed that

petitioner believed he was "doing well, getting along with others."  ABMR at 28.

He continued to have auditory hallucinations, but tried not to get depressed by

staying busy.  Id.  The physician noted that "[t]here has been noted improvement

over the last year following stabilization of patient symptoms on Risperidone."  Id.

at 29.  The physician also recorded a GAF of 40, +/- 5, and noted that:

> His speech was clear and coherent.  He is currently
> managing his auditory hallucinations without distress.
> He denies suicidal/homicidal ideations.  Fund of
> information and intelligence average.  Thought processes
> are goal directed.  Insight and judgement was good.  Self
> care is adequate.

Id. at 30.  The physician recommended that he stay in the Chronic Psychotic

Disorder program of Jester IV "due to the chronicity and severity of his psychotic

symptoms and his personality disorder."  Id. (emphasis added).

Petitioner's individual treatment plan from March 2, 2001 indicates that he

continued to struggle with depression and other symptoms that interfered with

activities of daily living.  FBMRS at 80.  During 2001, the goal was to stabilize

17

him so that he could function in a less restrictive environment.  Id.  He continued to take Doxepin, Lithium, Risperidone, and Benadryl.  Id. at 80, 205.  Records note that he refused medical appointments several times during 2001 and 2002, but do not reveal the reason.  See Id. at 82-85.  He was also taking Geodon,[24] a treatment for bipolar disorder, during this time.  Id. at 208.  In 2002, petitioner continued to be treated with Lithium and Doxepin, as well as Ziprasidone (Geodon) and Nortiptyline, an antidepressant.  Id. at 215-16.  In August 2002, Jester IV Unit doctors lowered his GAF score to 35 and revised his individual treatment plan to address his "[f]ailure to conform to social norms" and inability to "deal with personal issues."  Id. at 87.

### 3. Petitioner's Mental History at TDCJ-CID During 2003.

 On January 13, 2003, petitioner was "motivated, active, [and] attentive."  FBMRS at 89.  Jester IV Unit doctors adjusted his GAF upward to 38 and revised his individual treatment plan again.  Id.

Integrated progress notes for 2003 indicate that petitioner continued to take medication and participate in group therapy.  FBMRS at 106.  On January 13, 2003, he had "very good participation" in group therapy.  Id.  On January 27, 2003,

---

[24] "Geodon" is the trademark name for ziprasidone hydrochloride capsules or ziprasidone mesylate for injection.  PDR, supra n.2, at 2529.  Side effects include extrapyramidal symptoms, somnolence, akathisia, dizziness, and abnormal vision.  Id. at 2533.

18

he shared an experience relating to a provocation in the dayroom and asked for help determining the appropriate approach to the situation.  Id. at 107.

In February 2003, he discussed his problems of negative self-evaluation. FBMRS at 108.  He participated well in group discussions.  Id.  However, on February 5, 2003, it was noted that he "still hears voices - not as bad as before - wants more [medication] to stop the voices completely."  Id. (emphasis added).  On February 9, 2003, he stated, "I think I had a seizure last night.  I fell out in my cell and bumped my head.  No one seen or heard me.  Then I come through.  I called for a nurse."  Id. at 109.  Although he had bruises, it was not determined whether he had suffered a seizure at that time.  See id.  On February 10, 2003, he was verbal and spontaneous during group therapy, disclosed personal information, and displayed logical thinking.  Id.  He was in a dysphoric mood.  Id.  On February 17, 2003, he refused to take his medication.  Id. at 110.  He continued to be active and participate in group therapy throughout February 2003.  Id. at 111.

In March 2003, petitioner continued to participate in group therapy sessions and displayed a positive attitude.  FBMRS at 112.  He was still experiencing symptoms of depression, including low self worth, no motivation, and feeling miserable and alone.  Id.  On March 26, 2003, he requested that his antidepressant medication be increased so that he could feel calmer.  Id. at 113.  It was noted that

19

his schizoaffective disorder was stable and there was no evidence of active psychosis.  Id.  On March 31, 2003, he requested more information about his condition during group therapy.  Id. at 114.

In April 2003, petitioner requested Haldol to lessen hallucinations, but said that he was less depressed than he used to be.  FBMRS at 115.  He continued to actively participate in group therapy.  Id. at 116.   However, he also continued to suffer from psychotic thinking and a depressed mood.  Id. at 89.  In April 2003, his treatment plan was reviewed once again to address his poor adoptive functioning, socialization skills, and work skills.  Id. at 94.

In May 2003, doctors noted that petitioner had suicidal or homicidal ideations, as well as auditory and visual hallucinations.  FBMRS at 117.  He continued to actively participate in group therapy.  Id.  In June 2003, he also continued to participate in group therapy.  Id. at 119.  His treatment plan was modified again to address problems related to his "involvement in therapeutic activity," and to increase his participation in group therapy.  Id. at 95.  On June 23, 2003, he reported that his medications were helping to relieve voices and stress related to his illness.  Id. at 121.  In July 2003, he continued to actively participate in group therapy.  Id.  In mid-July 2003, the voices had lessened, as had his suicidal or homicidal ideations.  Id. at 122.  On July 30, 2003, he requested to

continue taking Haldol to lessen the voices he was hearing.  Id. at 123.

In August 2003, petitioner continued to actively participate in group therapy. FBMRS at 124.  In September 2003, he remained consistent in his level of participation.  Id. at 125.  In October 2003, he experienced dizziness, but the record does not indicate whether the cause was medication or mental illness.  See id. at 126.  The records indicate that the combination of medications he was taking was effective.  Id. at 127.  He continued to participate in group therapy, and demonstrated "remarkable improvement in mood."  Id.

In November 2003, petitioner continued to participate in group therapy, he had no signs of perpetual disturbances, no signs of depression, and no expression of suicidal ideations.  FBMRS at 131.  In December 2003, he continued to actively participate in group therapy.  Id. at 133.  On December 17, 2003, it was noted that he had started to have visual hallucinations once again.  Id. at 135.  On December 22, 2003, he requested increased medication to treat his audiovisual hallucinations. Id.

### 4.      Petitioner's Mental History at TDCJ-CID After 2003.

In January 2004, he had reported "seeing things crawling on the wall in [his] cell and on TV while in the dayroom."  Id. at 137 (emphasis added).  He continued to actively participate in group therapy.  Id. at 137-38.  In February 2004, he

complained of being "lightheaded" and reported falling.  Id. at 139.  Because he

would not accept medical help, the record does not indicate whether this episode

was caused by mental illness or by a reaction to his medication.  Id.

In April 2004, Jester IV Unit doctors increased petitioner's GAF score to 45

and discontinued his Haldol.  FBMRS at 97, 144.  However, he still reported

hearing voices, and requested that his Thorazine be increased.  Id. at 145.  He was

still being treated with Nortriptyline, Lithium, and Benadryl.  Id.  Doctors noted

that his medication compliance should be improved.  Id. at 97.

In May 2004, petitioner continued to actively participate in group therapy.

FBMRS at 146.  On May 24, 2004, he was admitted to the Jester IV medical clinic

for hypotension and auditory hallucinations.  Id. at 147.  On May 26, 2004, he

stated that he had felt dizzy and weak, but did not overdose on his medication.  Id.

He stated that he took Haldol and Benadryl when he heard voices.  Id.  It is not

clear from the records whether he was treated for side effects from his medication,

or for complications from underlying physical health problems.  See id. at 147-50.

He stated that he still heard voices and saw things, but could deal with his

problems.  Id. at 151.

In June 2004, petitioner had blood pressure problems, but he did not believe

that he took an extra dose of his medication.  FBMRS at 152.  He continued to

participate in group therapy.  Id.  In July 2004, he complained that he was not
receiving the proper medications.  Id. at 155.  He continued to actively participate
in group therapy, but would not attend a scheduled medical appointment on July
22, 2004.  Id. at 156-57.

Petitioner's condition was unstable for the next few months.  On August 9,
2004, petitioner stated that "[m]y medicine's driving me crazy.  I can't stop
shaking."  FBMRS at 157.  He had substantial motor agitation.  Id.  On August 18,
2004, he stated that he shook continuously and became nauseated when he took his
Haldol.  Id. at 159.  He was still hearing voices.  Id.  On August 23 and 24, 2004,
he again refused to attend medical appointments.  Id. at 159-60.  On August 23,
2004, a Jester IV Unit doctor noted that he was preoccupied during therapy and did
not participate.  Id. at 161.  On August 26, 2004, he reported that he was scared of
his cellmate, whom he said was not taking his medication.  Id.  By September
2004, his symptoms had decreased.  Id. at 162.  He was still "slightly irritable," but
cooperative.  Id. at 164.

In October 2004, petitioner's condition declined further.  FBMRS at 165.
He stated that his medicine was no longer helping, and that "the voices are driving
me crazy."  Id.  In November 2004, he stated that he was doing better, but was still
experiencing "minor shakes."  Id. at 167.  However, the voices were increasing and

23

he wanted to increase his medication.  Id.  On November 15, 2004, he stated that the Haldol was causing him to vomit.  Id.  On November 23, 2004, he once again refused medical treatment.  Id. at 168.  On December 13, 2004, petitioner's symptoms had not improved, and he stated, "I'm hearing more voices telling me to hurt others."  Id. at 169.

Beginning in 2005, marked improvements in his condition were noted.  By December 2005, he was compliant with his medication regimen and was doing well.  ABMR at 321.  He denied hearing voices or experiencing thoughts of harming himself or others.  Id.  He was "very prosocial" and seemed to have a lot of friends once he was transferred from the Jester IV Unit to the Skyview Unit.[25] Id. at 385.  However, he did continue to experience some anxiety and auditory and visual hallucinations.  Id.

Petitioner's stable condition continued into 2006.  ABMR at 314.  In March 2006, although he was doing well and complying with his treatment regimen, he reported that he thought about killing himself and still heard voices.  Id. at 311. Overall, however, his condition was remarkably improved.  Id.  By April 2006, he was again denying any suicidal or homicidal ideations.  Id. at 310.  By May 2006,

─────────────────

[25] Petitioner was still at the Jester IV Unit in January 2005, but had been transferred to the Skyview Unit by March 2005.  FBMRS at 474-75.

he even denied hearing voices.  <u>Id.</u> at 305.  In September 2006, he stated that he

was once again hearing voices, but was not suicidal.  <u>Id.</u> at 382.  He was compliant

with his medication and continued to participate in group therapy.  <u>Id.</u>  He denied

having any side effects from his medication.  <u>Id.</u>  In October 2006, he was still

doing well.  <u>Id.</u> at 296.  At the end of 2006, he was "stable."  <u>Id.</u> at 291.

### III.  STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure applies to federal habeas

corpus cases.  <u>Clark v. Johnson</u>, 202 F.3d 760, 764 (5th Cir. 2000).  Summary

judgment is appropriate when there is no disputed issue of material fact, and one

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A court

must consider the record as a whole by reviewing all pleadings, depositions,

affidavits, and admissions on file, and by drawing all reasonable inferences in

favor of the party opposing the motion.  <u>Caboni v. Gen. Motors Corp.</u>, 278 F.3d

448, 451 (5th Cir. 2002).

The party seeking summary judgment bears the initial burden of informing

the court of the basis for its motion and identifying those portions of the pleadings,

depositions, answers to interrogatories, admissions on file, and affidavits, if any,

which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Williams v. Adams</u>, 836 F.2d

958, 960 (5th Cir. 1988).  The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party.  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Bledsoe v. City of Horn Lake, Miss., 449 F.3d 650, 652-53 (5th Cir. 2006) ("When the facts [underlying a motion for summary judgment] are disputed, the court does not determine the credibility of the evidence and draws all justifiable inferences in favor of the nonmovant").

If the moving party makes the required showing, then the burden shifts to the non-movant to show that summary judgment is not appropriate.  Matsushita, 475 U.S. at 587; Fields v. City of S. Houston , 922 F.2d 1183, 1187 (5th Cir. 1991).  The non-movant cannot rest on the mere allegations of the pleadings to sustain his burden, but must set forth material controverted facts in the response to the motion for summary judgment.  Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Summary judgment is proper if the non-movant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof. ContiCommodity Servs., Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995); Celotex, 477 U.S. at 322-23.

# IV.  DISCUSSION

**A.**     **Respondent is Not Entitled to Summary Judgment on the Equitable Tolling Issue.**

   **1.**     **Equitable Tolling for Mental Incapacity Pursuant to the AEDPA.**

Pursuant to the AEDPA, a one-year period of limitations applies to an "application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1).  The statute specifies that the limitations period runs from the latest of the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by state action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

This filing deadline is a statute of limitations, not an inflexible jurisdictional requirement.  Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998).  The Supreme

Court recently assumed without deciding that equitable tolling is available to habeas petitioners.  Lawrence v. Florida, _ U.S. _, 127 S. Ct. 1079, 1085 (2007). The Lawrence Court explained that a petitioner would have to "show '(1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Id. (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).  The Fifth Circuit has held that "[d]ismissing a habeas petition is a 'particularly serious matter,'" and therefore the AEDPA limitations period may be "subject to equitable tolling in 'rare and exceptional circumstances.'" Prieto v. Quarterman, 456 F.3d 511, 514 (5th Cir. 2006) (quoting Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999) and Davis, 158 F.3d at 811).  "The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." Davis, 158 F.3d at 810 (citation omitted).

The Fifth Circuit has determined that equitable tolling is appropriate when "rare and extraordinary" circumstances beyond a habeas petitioner's control prevents a timely-filed petition. United States v. Wynn, 292 F.3d 226, 230 (5th Cir. 2002); see also Coleman v. Johnson, 184 F.3d 398, 402 (5th Cir. 1999) (per curiam).  "A 'garden variety claim of excusable neglect, does not support equitable tolling.'" Coleman, 184 F.3d at 402 (citation omitted).  Like all equitable

doctrines, equitable tolling is "'not intended for those who sleep on their rights.'" Fisher, 174 F.3d at 715 (quoting Covey v. Ark. River Co., 865 F.2d 660, 662 (5th Cir. 1989)).

In Fisher, the Fifth Circuit explained that "equitable tolling does not lend itself to bright-line rules, but we draw on general principles to guide when equitable tolling is appropriate.  We must be cautious not to apply the statute of limitations too harshly."  Id. at 713 (emphasis added).  The petitioner in Fisher spent just seventeen days of the AEDPA one-year period of limitations in a psychiatric ward, and still had over six months to complete a federal habeas petition after returning to his usual quarters.  See id. at 715.  However, he requested that the statute of limitations be tolled for 43 days.  Id. at 714.  The Fifth Circuit found that "a brief period of incapacity during a one-year statute of limitations, even though rare, does not necessarily warrant equitable tolling."  Id. at 715 (emphasis added).  Indeed, he had 322 days in which to timely file his petition. Id.

The Fifth Circuit has, however, explained that "mental incompetency might support equitable tolling of a limitation period."  Fisher, 174 F.3d at 715 (citation omitted); Smith v. Johnson, 247 F.3d 240, 2001 WL 43520, at *3 (5th Cir. Jan. 3, 2001) (per curiam) (unpublished) ("a prisoner's claim of mental incompetence may

29

support tolling the AEDPA time limit if the mental impairment precluded the prisoner from effectively asserting his legal rights"); see also Calderon v. U.S. Dist. Ct. for the Cent. Dist. of Cal., 163 F.3d 530, 541 (9th Cir. 1998) (en banc) (finding that a "putative habeas petitioner's mental incompetency [is] a condition that is, obviously, an extraordinary circumstance beyond the prisoner's control" and that a threshold showing of mental incompetency was sufficient to toll AEDPA's statute of limitations); cf. Hood v. Sears Roebuck & Co., 168 F.3d 231, 232 (5th Cir. 1999) (discussing traditional rule that equity tolls a statute of limitations when mental illness "prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them.").

Nonetheless, the Fifth Circuit has yet to equitably toll AEDPA's deadlines because of a petitioner's mental incapacity.  Courts within the Fifth Circuit have denied equitable tolling to petitioners claiming mental incapacity either because they do not plead, or adduce facts sufficient to support their claims of incapacity, e.g. Smith, 247 F.3d at *3; Heidle v. Dretke, No. 3-04-CV-2627-D, 2005 WL 81716, at *1 (N.D. Tex. Jan. 12, 2005) (unpublished) (denying equitable tolling where petitioner failed to allege or prove that "mental disabilities prevented him from seeking post-conviction review during the AEDPA limitations period."); Hennington v. Johnson, No. 4:00-CV-0292-A, 2001 WL 210405, at *4 (N.D. Tex.

30

Feb. 28, 2001) (unpublished) (finding evidentiary burden unmet by "conclusory" assertions), or because they were plainly able to manage their legal affairs during their alleged incapacity. <u>Hennington</u>, 2001 WL 210405, at *4 n.9 (observing that petitioner's various lawsuits during the period for which he sought tolling belied any claim that his mental illness prevented him from managing his legal affairs); <u>see</u> <u>also</u> <u>Gaston v. Palmer</u>, 417 F.3d 1030, 1034-35 (9th Cir. 2005) (equitable tolling unwarranted where petitioner was able to file state applications before and after the limitations period); <u>Rowe v. Maine</u>, 324 F. Supp.2d 238, 240-42 (D. Me. 2004) (denying equitable tolling where petitioner's only evidence was 1995 Adjudication of Incapacity and he had filed numerous <u>pro</u> <u>se</u> actions since that adjudication).

There is no mandatory authority that controls the disposition of the instant case; however, the Southern District of New York tolled AEDPA's statute of limitations under similar circumstances. <u>Benn v. Greiner</u>, 275 F. Supp.2d 371, 372-74 (E.D.N.Y. 2003). After conducting an evidentiary hearing, the district court found that the petitioner was entitled to equitable tolling of the AEDPA's limitations period:

> This court, with permission from petitioner, ordered respondent to produce petitioner's prison psychiatric records. The records indicate that petitioner suffers from depression and schizophrenia. <u>He is prone to distracting</u>

<u>auditory hallucinations</u>.  <u>He has been confined to the
mental health ward</u> of Sing Sing for much of his
sentence.  When he has been housed in the general prison
population he has retained frequent contact with the
mental health ward and has struggled to cope with his
psychological problems in that setting.  <u>A
pharmacological regimen appears to have eased
somewhat petitioner's psychological problems, but his
psychiatric status remained essentially unchanged during
the entire period of his incarceration</u>.

<u>Petitioner's state collateral proceedings and his federal
habeas applications were initiated with the help and at the
behest of fellow inmates</u>.  Prison doctors *hope* that some
day, upon his release from prison, petitioner "could be
expected to understand and apply simple directions," and
"execute simple but not complex directions with
supervision".... Under these circumstances, petitioner has
demonstrated that extraordinary circumstances beyond
his control prevented him from timely filing his petition.
Equitable tolling is warranted.

<u>Id.</u> at 373-74 (emphases added) (italics in original).

> **2.    Petitioner Must Establish That He is Entitled to Equitable
> Tolling.**

The Fifth Circuit has held that a habeas petitioner has the ultimate burden of

proving that equitable tolling of the AEDPA's limitations period should apply.

<u>Phillips v. Donnelly</u>, 216 F.3d 508, 511 (5th Cir. 2000) (per curiam) (citations

omitted), <u>rhg. granted in part</u>, 223 F.3d 797 (5th Cir. 2000) (per curiam).  In

addition, the Fifth Circuit has determined that mental "competency is a question of

fact as opposed to a mixed question of law and fact or a question of law."  <u>United</u>

States v. Williams, 819 F.2d 605, 607 (5th Cir. 1987) (citations omitted); see also Doe v. Henderson Indep. Sch. Dist., 237 F.3d 631, 2000 WL 1701752, at *3-4 (5th Cir. 2000) (per curiam) (unpublished) (citation omitted) (discussing mental competency in the context of summary judgment); see also Helton v. Clements, 832 F.2d 332, 334-36 (5th Cir. 1987) (discussing the determination of mental competency for purposes of determining whether statute of limitations would be tolled in civil rights suit).

> **3.   Respondent Has Not Shown that Summary Judgment Should be Granted.**
>
> > **a.   Legal Standards Regarding the Use of Affidavits on Summary Judgment.**

The Fifth Circuit has determined that "[o]n an application for a writ of habeas corpus, the district court has the discretion to receive evidence via affidavits." Valdez v. Cockrell, 274 F.3d 941, 958 (5th Cir. 2001) (citations omitted).  However, "unsupported ... affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." Orthopedic & Sports Injury Clinic v. Wang Labs, Inc., 922 F.2d 220, 225 (5th Cir. 1991) (citations omitted).  Affidavits submitted by experts must be supported by facts.  Boyd v. State Farm Ins. Cos., 158 F.3d 326, 331(5th Cir. 1998); Slaughter v. Southern Talc Co., 919 F.2d 304, 307 n.4 (5th Cir.

1990).

It is error for a district court to determine on summary judgment whether

affidavit is credible or to determine fact issues by reference to an opposed affidavit.

"Credibility determinations are not part of the summary judgment analysis."

Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist., 308 F.3d 451,

458 (5th Cir. 2002) (citing Anderson, 477 U.S. at 247-49).  "[I]n summary

judgment proceedings, '[t]he judge's function is not himself to weigh the evidence

and determine the truth of the matter.'"  Fabela v. Socorro Indep. Sch. Dist., 329

F.3d 409, 416 (5th Cir. 2003) (quoting Anderson, 477 U.S. at 249).  The Fifth

Circuit applies these rules to motions for summary judgment in 28 U.S.C.

§ 2254 proceedings.  Kelly v. Dretke, 111 Fed. Appx. 199, 208 (5th Cir. Aug. 10,

2004) (unpublished) (reversing district court's grant of summary judgment because

it made an adverse credibility determination concerning an affidavit provided in

support of petitioner).

> **b.   Affidavits from Petitioner's and Respondent's Mental
>         Health Experts are Contradictory and All Supported by
>         Facts in the Record.**

Respondent asserts that while a petitioner's mental incompetence may toll

the AEDPA's statute of limitations, the burden is on petitioner to prove that mental

incompetence rendered him unable to timely file a federal habeas petition, and

petitioner has not met his burden.  (D.E. 76, at 6).  Respondent asserts that

petitioner was, at the very minimum, competent throughout 2003.  Id. at 7.

Respondent submitted affidavits from Dr. William Reading and Christopher Igwilo

in support of summary judgment.  Dr. Reading is a psychiatrist who is the Jester IV

Unit's Clinical Director.  (D.E. 76, Ex. 2 at 1).  Mr. Igwilo is a staff

psychotherapist employed at the Jester IV Unit.  (D.E. 76, Ex. 1 at 1).

Dr. Reading, who treated petitioner during his time in TDCJ-CID and during

the relevant time period during 2003, testified:

> In the course of my duties at Jester IV, I have provided
> medical treatment to Leland Boothe, and have overseen
> the treatment provided by others.  I have also had an
> opportunity to review the "Boothe Medical Records,"
> "Additional Boothe Records," "Final Boothe Medical
> Records," and "Miscellaneous Administrative Boothe
> Records" that have been submitted for consideration in
> Mr. Boothe's federal habeas corpus lawsuit.
>
> Mr. Boothe has been diagnosed with schizophrenic
> disorder.  This disorder is characterized with
> hallucinations and delusions but not disorientation or
> confusion.  The functional debilitation varies from the
> illness being virtually undetectable by an untrained
> person to a severe debilitation.  However, if treated, the
> individual may return to normal functioning even if there
> was severe debilitation before treatment.
>
> Based upon my treatment of Mr. Boothe and review of
> his records, I believe that he was competent to pursue his
> legal rights, or help someone else file a lawsuit on his
> behalf, at a minimum during the period January 2003

through December 2003.

I base this belief on several facts.  First and most basically, Mr. Boothe's medical records show that during his time at Jester IV, he understood that he was incarcerated as a result of the murder that he committed. The records indicate that Mr. Boothe actively participated in his treatment program, requesting adjustments in his medication based on their effectiveness.  He further requested literature regarding his medical treatment, and medical studies associated with schizophrenic disorder and drug use.  Such behavior indicates that, during this time he was capable of seeking help for any medical or legal problems and concerns that he may have had.

(D.E. 76, Ex. 2, at 1-2) (emphasis added).  Mr. Igwilo provided nearly identical

testimony as Dr. Reading:

In the course of my duties at Jester IV, I have provided medical treatment to Leland Boothe, and have overseen the treatment provided by others.  I have also had an opportunity to review the "Boothe Medical Records," "Additional Boothe Records," "Final Boothe Medical Records," and "Miscellaneous Administrative Boothe Records" that have been submitted for consideration in Mr. Boothe's federal habeas corpus lawsuit.

Based upon my treatment of Mr. Boothe and review of his records, I believe that he was competent to pursue his legal rights, or help someone else file a lawsuit on his behalf, at a minimum during the period January 2003 through December 2003.

I base this belief on several facts.  First and most basically, Mr. Boothe's medical records show that during his time at Jester IV, he understood that he was incarcerated as a result of the murder that he committed.

36

> The records indicate that Mr. Boothe actively participated
> in his treatment program, requesting adjustments in his
> medication based on their effectiveness.  He further
> requested literature regarding his medical treatment, and
> medical studies associated with schizophrenic disorder
> and drug use.  Such behavior indicates that, during this
> time he was capable of seeking help for any medical or
> legal problems and concerns that he may have had.

(D.E. 76, Ex. 1, at 1-2).

Petitioner refutes the conclusions drawn by Dr. Reading and Mr. Igwilo, and asserts that all his active participation in a group setting proves is that he may have functioned better in a group setting than he could have functioned individually during 2003, and that his medical records suggest he still experienced symptoms of his mental illness when he was not in group therapy.  (D.E. 79, at 11).  In support of his argument, petitioner's counsel submitted the affidavit of Dr. Troy Martinez, a licensed psychologist, who is currently "employed part-time at North Texas State Hospital (NTSH)-Vernon Campus, which is the State's only maximum security forensic psychiatric hospital" and "was previously employed full-time at NTSH from September 1998 until June 2004, most recently as Chief Forensic Psychologist of the Behavioral Management Treatment Program, providing and coordinating assessment and multi-disciplinary treatment services to adult psychiatric patients committed under criminal statutes."  (D.E. 79, Ex. 7, at 1). After reviewing petitioner's records, he testified:

None of the available TDCJ records directly address the issue of whether or not Mr. Boothe was mentally competent to file a timely habeas petition.  Thus, only inferences can be drawn concerning his mental ability based on observations by others in contact with Mr. Boothe in therapeutic contexts.  Affidavits by Christopher Igwilo, LPC and Dr. William Reading, psychiatrist, capture some of the information, in piecemeal fashion, listed in TDCJ records specific to the context of therapeutic settings observed by these professionals.  Their records appear most active between January through December of 2003.  Their Affidavit conclusions, however, ignore the larger impact that context has on their observations, which in turn forms a primary basis of their opinion.  Specifically, a mentally ill person's functioning, especially as relates to complexity of task requirements, is frequently enhanced within a structured group therapy setting.  This "enhancement" is a function of important external structures provide [sic] by the immediate treatment environment (e.g., group therapy, brief therapeutic contacts).  However, without these immediate supports in place (i.e., outside the therapeutic context), the artificial enhancements masking underlying impairments become more apparent in the patient's personal life.  This is most commonly true for individuals whose symptom profile is not stabilized or treated into a phase of remission....

I would expect that Mr. Boothe's operational performance between January through December 2003 was highest within group therapy sessions followed then by other therapeutic activities high in structure, support, affirmation, and where expectations concerning his behavior are clearly delineated.  The functioning of a therapeutic group as a whole is often higher or more operational than any of its contributing parts, especially when that group dynamic is further guided by the regular presence of a stabilizing mental health professional(s)....

> In Mr. Boothe's case, outside this therapeutic context and
> without the external resources/supports, an individual
> with *active* symptoms of major mental illness is often *not*
> able to *independently* sustain an equal level of mental
> effort, focus, and efficiency of cognitive operation.  That
> Mr. Boothe was functioning at that time under the
> influence of *active* symptoms of major mental illness is
> clear from TDCJ records themselves, which document
> (and probably under record frequency of) psychotic
> symptoms such as auditory and visual hallucinations.

(D.E. 79, Ex. 7, at 2-3) (emphasis in original).  Dr. Martinez attributes respondent's

perceptions of petitioner's functioning in group therapy to a "Pygmalion effect" or

"expectancy effect," which he explains is "a concept in psychology describing the

phenomena in which behavior of individuals will be perceived as observers/raters

expect them to behave; a type of self-fulfilling prophecy...."  Id. at 3.

Petitioner has not filed any other lawsuits since his incarceration; this tends

to support a finding that he was mentally incompetent for the purposes of tolling

AEDPA's statute of limitations.  See Aiello v. Warden, SCI Graterford, No. 03-

CV-1655, 2006 WL 1050283, at *4 (E.D. Pa. Apr. 20, 2006) (unpublished) (tolling

AEDPA's statute of limitations on equitable grounds; noting that "[i]t is ...

significant that [petitioner's] record does not include any instances where he

asserted his rights or registered other complaints.").

### c.   There is a Genuine Issue of Material Fact that this Court Should Not Decide on the Affidavits.

The affiants, on the same medical records, have reached sharply different conclusions about petitioner's mental capacity.  Petitioner's 2003 medical records are subject to different interpretations.  At times, they are positive, indicating he was attentive, engaged in group therapy, and responded to medication.  See, e.g., FBMRS at 89, 106, 111, 113, 116, 117, 121-22, 124, 127.  These records also reflect that petitioner was still struggling with mental illness including psychotic episodes.  See, e.g., id. at 89, 108, 110, 112-13, 115, 117, 123, 135.  While the physician and therapist who have treated petitioner during his incarceration and have first hand knowledge of his abilities have concluded that his participation in group therapy and instances of him requesting medication suggest that he was competent to undertake legal proceedings, no explanation of the possible adverse effects of petitioner's medications or the impact of his auditory and visual hallucinations on his activities of daily living has been given to the Court.  See United States v. Watson, 893 F.2d 970, 978 (8th Cir. 1990) ("Patients taking antipsychotic medications sometimes experience painful side effects, including muscle spasms, restlessness, agitation, and parkinsonisms."); Bee v. Greaves, 744 F.2d 1387, 1394 (10th Cir. 1984) ("Antipsychotic drugs have the capacity to severely and even permanently affect an individual's ability to think and

40

communicate."); In re K.K.B., 609 P.2d 747, 748 n.3 (Okla. 1980) (noting the severity of side effects often associated with psychotropic drugs used to treat schizophrenia).  Petitioner provided evidence, including medical records and an expert witness affidavit, which if deemed credible would establish that petitioner is entitled to tolling of the AEDPA's limitations period.

The records and affidavits presented would require this Court to make an impermissible credibility determination if it were to grant summary judgment. Accordingly, it is respectfully recommended that respondent's motion for summary judgment be denied.

**B.     This Court Should Hold an Evidentiary Hearing to Determine Whether to Toll AEDPA's Statute of Limitations.**

The Fifth Circuit has explained that "[u]nder AEDPA, a habeas petitioner's entitlement to an evidentiary hearing when he has failed to develop the factual basis of a claim is restricted to the narrow exceptions of 28 U.S.C. § 2254(e)(2)." Clark v. Johnson, 202 F.3d 760, 765 (5th Cir. 2000).  However, AEDPA does not govern evidentiary hearings on excuses for failing to comply with statutory requirements.  Vineyard v. Dretke, 125 Fed. Appx. 551, 553-54 (5th Cir. Mar. 14, 2005) (per curiam) (unpublished); see also Cristin v. Brennan, 281 F.3d 404, 413 (3d Cir. 2002) ("Section 2254(e)(2) was not intended to govern all evidentiary hearings in habeas actions.").  Therefore, this Court should apply the approach

developed prior to AEDPA for when to hold an evidentiary hearing in a habeas case.  Vineyard, 125 Fed. Appx. at 553-54; Clark, 202 F.3d at 766.

In Clark, the Fifth Circuit explained "[p]rior to the enactment of AEDPA, we consistently held that when there is a factual dispute which 'if resolved in the petitioner's favor, would entitle [the petitioner] to relief and the state has not afforded the petitioner a full and fair hearing,' a federal habeas corpus petitioner is entitled to discovery and an evidentiary hearing."  202 F.3d at 766 (quoting Perillo v. Johnson, 79 F.3d 441, 444 (5th Cir. 1996)).  The leading pre-AEDPA Supreme Court case determined that "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." Townsend v. Sain, 372 U.S. 293, 312-13 (1963); see also O'Bryan v. Estelle, 714 F.2d 365, 403 (5th Cir. 1983) ("if the state court has not conducted a full and fair hearing, or if the material facts were not adequately developed, or if the state court did not make any factual findings or credibility determinations, then an evidentiary hearing must be held by the federal district court") (citations omitted).  This Court should hold a hearing because petitioner might be entitled to relief and has not had a full and fair hearing on the issue of his mental incompetence in 2003.  See Vineyard, 125 Fed. Appx. at 553-54; Murphy v. Johnson, 205 F.3d 809, 815 (5th Cir. 2000); see also Laws v. LaMarque, 351 F.3d 919, 923 (9th Cir. 2003) (finding

that district court erred in dismissing habeas petition without first developing a

factual record on petitioner's claim for equitable tolling due to mental incapacity);

Guy v. Cockrell, 343 F.3d 348, 354 (5th Cir. 2003) (requiring hearing in addition

to affidavits and other evidence in the record to determine credibility); Nara v.

Frank, 264 F.3d 310, 320 (3d Cir. 2001) ("because [petitioner] originally filed his

habeas petition *pro se*, and because he has presented evidence of ongoing, if not

consecutive, periods of mental incompetency, an evidentiary hearing is

warranted"), overruled in part on other grounds by Carey v. Saffold, 536 U.S. 214

(2002).

　　　　In the Fifth Circuit, "[p]ursuant to Rule 8 of the Rules Governing § 2254

Cases, the district court retains discretion over the decision to grant an evidentiary

hearing once a petitioner overcomes the barriers presented by § 2254(e)(2)."

Clark, 202 F.3d at 765.  Rule 8(a) explains that

> [i]f the petition is not dismissed, the judge must review
> the answer, any transcripts and records of state-court
> proceedings, and any materials submitted under Rule 7 to
> determine whether an evidentiary hearing is warranted.

Here, there are no transcripts from the state court addressing the issue of equitable

tolling.  Moreover, the parties have already expanded the record pursuant to Rule

7.  There is a factual dispute about petitioner's competency centering on the

credibility of various witnesses and their interpretations of petitioner's medical

43

records.  Therefore, it is respectfully recommended that this Court conduct an evidentiary hearing on whether petitioner is entitled to equitable tolling.

## V.  RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that respondent's motion for summary judgment, (D.E. 76), be denied.  Furthermore, it is respectfully recommended that an evidentiary hearing should be held to determine whether petitioner is entitled to equitable tolling of the AEDPA limitations period.

Respectfully submitted this 11th day of September 2007.

_____
BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; 28 U.S.C. § 636(b)(1)(C); and Article IV, General Order no. 2002-13; United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except on grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto. Ass'n.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).