IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

LELAND BOOTHE,                    §
                  Petitioner,     §
                                  §
v.                                §          C.A. NO. C-06-221
                                  §
NATHANIEL QUARTERMAN,             §
                  Respondent.     §

## MEMORANDUM AND RECOMMENDATION
## REGARDING PETITIONER'S EQUITABLE TOLLING CLAIM

Petitioner is an inmate in the Texas Department of Criminal Justice,

Criminal Institutions Division ("TDCJ-CID"), and currently is incarcerated at the

Skyview Unit in Rusk, Texas.  Proceeding pro se, petitioner filed this habeas

corpus petition pursuant to 28 U.S.C. § 2254.  (D.E. 1).

On July 31, 2006, respondent filed a motion to dismiss the petition as time

barred by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  (D.E.

17).  On August 17, 2006, petitioner responded to that motion.  (D.E. 20).  In his

response, he stated that he was incompetent during the nine years he spent at the

Jester IV Unit, and therefore, his petition was not time barred.  (D.E. 20, at 3-4).

On January 5, 2007, petitioner was appointed counsel to conduct discovery in

connection with petitioner's claim for equitable tolling of the AEDPA's limitations

period.  (D.E. 52).  On February 7, 2007, the Court issued an order denying the

parties' pending motions without prejudice until further discovery could be completed. (D.E. 58). On April 26, 2007, respondent filed a motion for summary judgment, (D.E. 76), after submitting petitioner's medical and TDCJ-CID administrative records. (D.E. 12, 41, 44, 71, 73). Petitioner responded on June 11, 2007. (D.E. 79). Both parties have submitted affidavits and documentary exhibits in support of their respective positions. (D.E. 76, 79). On November 20, 2007, respondent submitted additional state court records. (D.E. 90).

On November 28, 2007 and November 29, 2007, an evidentiary hearing was held to determine whether petitioner is entitled to equitable tolling of the AEDPA limitations period. Both parties have filed post-hearing briefs. (D.E. 101, 102). For the reasons stated herein, it is respectfully recommended that petitioner is not entitled to equitable tolling of AEDPA's limitation period.

## I. JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 2241, 2254, which provide that jurisdiction is proper where the inmate is confined, or where the conviction was obtained. Wadsworth v. Johnson, 235 F.3d 959, 961-62 (5th Cir. 2000). Petitioner was convicted by the 347th Judicial District Court of Nueces County, Texas, and therefore, jurisdiction is proper in this Court.

2

## II.  PROCEDURAL BACKGROUND

Petitioner is currently serving a fifty-year sentence for first degree murder. (D.E. 12-2, at 27) (State v. Boothe, 96-CR-1563-H).  The day after the murder, he overdosed on heroin and cocaine in an attempt to commit suicide.  (D.E. 12-5, at 14).  Following treatment for the overdose, he voluntarily checked himself into Southside Health Center's Department of Behavioral Medicine for treatment and evaluation.  Id.  While he was at Southside Health Center, Sergeant R.B. Maxwell interviewed him.  After being warned of his Miranda rights, he confessed to the murder.  (D.E. 12-4, at 2).  Pursuant to a plea agreement, he pleaded guilty and was incarcerated in 1996.  (D.E. 12-2, at 28).

Petitioner filed an application for a state writ of habeas corpus on September 30, 2005.  Ex Parte Boothe, App. No. 63,262-01 at 2.  On March 1, 2006, the Texas Court of Criminal Appeals denied his state habeas petition without written order.  Id.  He filed a federal petition for habeas corpus with this Court on April 14, 2006.  (D.E. 1, at 8).

On July 31, 2006, respondent filed a motion to dismiss the petition as time barred by § 2244 of the AEDPA.  (D.E. 17).  On August 17, 2006, petitioner responded to that motion, arguing that he was incompetent during the nine years he spent at the Jester IV Unit, and therefore, his petition was not time barred.  (D.E.

20, at 3-4).  On January 5, 2007, petitioner was appointed counsel to conduct

discovery in connection with petitioner's claim for equitable tolling of the

AEDPA's limitations period.  (D.E. 52).  Respondent filed a motion for summary

judgment, (D.E. 76), after submitting petitioner's medical and TDCJ-CID

administrative records.  (D.E. 12, 41, 44, 71, 73).  On June 11, 2007, petitioner

responded and filed his expert witness report.  (D.E. 79).  On November 7, 2007,

respondent filed an expert witness report.  (D.E. 88).

On November 20, 2007, respondent filed additional state court records.

(D.E. 90).  The first document, from the Jester IV law library, indicates that

petitioner checked out the Texas Code of Criminal Procedure and a volume on

child adoption on December 27, 2004.  Id. at 3.  It also shows that petitioner

checked out a legal directory on December 31, 2004.  Id. at 4.  The second

document, a Jester IV mail log, establishes that petitioner sent legal mail to Richard

Haynes, a lawyer in Houston, Texas on December 29, 2004, and to the law firm of

Ratliff, Edwards, and DeHoyos on December 22, 2004.  Id. at 7-8.  The final

document is a typewritten letter from petitioner to Don and Lisa Ellis, dated

October 29, 2007.  Id. at 10-12.

### III.  EVIDENCE PRESENTED AT THE EVIDENTIARY HEARING

On November 28, 2007 and November 29, 2007, an evidentiary hearing was held to determine whether petitioner is entitled to equitable tolling of the AEDPA limitations period.  Five witnesses testified: Dr. Troy Martinez, petitioner's expert; Leland Boothe, petitioner; Christopher Igwilo, a licensed counselor whose group therapy notes comprise the bulk of the medical record; Dr. William Reading, medical director of the Jester IV Unit; and Dr. Roger Saunders, respondent's expert.  Following the hearing, the parties filed briefs on four issues: the applicable burden of proof; the standard for equitably tolling of AEDPA's limitation period due to mental illness; whether statutory tolling is available to petitioners for whom the period is equitably tolled; and whether equitable tolling remains available in the Fifth Circuit in light of <u>Bowles v. Russell</u>, __ U.S. __, 127 S. Ct. 2360 (2007). (D.E. 101, 102).

### A.    Dr. Troy Martinez

Petitioner's first witness, Dr. Troy Martinez, is a forensic psychologist who has a doctorate in clinical psychology and began specializing in forensics in 1998, during his internship.  Transcript of Evidentiary Hearing, Volume 1, at 15-16;[1]

---

[1] The transcript of the evidentiary hearing is filed in two separate docket entries, one for each day of the hearing.  (D.E. 97, 98).  References to (D.E. 97) are abbreviated "Tr., Vol. 1." References to (D.E. 98) are abbreviated "Tr., Vol. 2."

see also Petitioner's Exhibit 2.[2]  He worked full-time at North Texas State Hospital in Vernon, which is Texas' only maximum security forensic psychiatric hospital, from 1998 until June 2004.  The last two years, he served as the hospital's Chief Forensic Psychologist of the Behavior Management Treatment Program.  Tr., Vol. 1, at 16-17.

Dr. Martinez explained that schizoaffective disorder is basically a combination of schizophrenia and either depression or mania.  Id. at 48-49.  He testified that psychotic individuals who experience a major depressive episode can experience an extreme form of apathy that actually diminishes their capacity to act. Id. at 28.  He said that some psychotic individuals lose the ability to foresee the consequences of their action or inaction.  Id. at 29.

Dr. Martinez explained that psychotic individuals exhibit symptoms including hallucinations, which are solely perceptual disturbances, and delusions, which impact a person's thinking.  Id. at 22-23.  He noted that people react to psychotropic medications differently; some may experience side effects which cause further impairment.  Id. at 34-35.  He described a "balancing act" by which physicians weigh the impairment caused by side effects against the illness itself, and "fine tune" medications to reach an optimal dosage.  Id. at 35-36.  He inferred

---

[2] "Petitioner's Exhibit" is hereinafter abbreviated "Pet'r Ex."

from petitioner's requests for more medication that his symptoms were becoming worse. Id. at 51.

Dr. Martinez explained that the medical records indicated that petitioner had been chronically mentally ill since arriving at TDCJ, and never experienced any meaningful state of remission. Id. at 39. Throughout 2003, there were records of petitioner hallucinating. Id. at 40. According to Dr. Martinez, hallucinations compete with other thoughts for access to a patient's mental capacities. Id. Patients often exhibit a higher level of functioning when distracted from their hallucinations, e.g., engaging in conversation, than when alone. Id. at 42-43. He felt that while petitioner had some capacity for abstract thought, he might not be able to sustain high-level thinking. Id. at 47. Sustaining mental effort is a higher-level function than generating ideas or starting projects, especially as complexity increases. Id. at 47-48. He believed that the medical records probably did not capture the full extent of petitioner's mental illness because patients often function better in a group environment. Id. at 50. In his opinion, nothing in the record demonstrated that petitioner was capable of expending sustained effort on a complex task. Id. at 48.

Dr. Martinez testified that diagnosticians consider psychological, social, and occupational functioning in determining a Global Assessment of Functioning

7

("GAF") score.  Id. at 52.  The GAF measures the functional impact of Axis I and

Axis II diagnoses.[3]  Id. at 54.  Dr. Martinez explained that the DSM-IV, which

contains the GAF scale, exists to help practitioners communicate by giving them a

"language to describe clusters or constellations of symptoms."  Id. at 58-59.

According to Dr. Martinez, a score of eighty or above would be normal.  Id. at 53.

A score of fifty or below indicates serious impairment in communication or

judgment that impacts their ability to function in society.  Id.  Petitioner's GAF of

38 on January 13, 2003, was low enough that it would be "very reasonable to

conclude that a person ... would have serious problems" with independently

sustaining an effort to file legal pleadings.  Id. at 55-57; see also Pet'r Ex. 10.  His

GAF of 24 on April 1, 2003 indicated behavior "considerably influenced by

---

[3] The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, explains that:

> [a] multiaxial system involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome.  There are five axes included in the DSM-IV multiaxial classification:

| Axis I | Clinical Disorders |
|---|---|
| | Other Conditions That May Be a Focus of Clinical Attention |
| Axis II | Personality Disorders |
| | Mental Retardation |
| Axis III | General Medical Conditions |
| Axis IV | Psychosocial and Environmental Problems |
| Axis V | Global Assessment of Functioning. |

Diagnostic and Statistical Manual of Mental Disorders 27 (4th ed. 2000) [hereinafter DSM-IV].

delusions or hallucinations or serious impairment in communication or judgment or an inability to function at almost all areas."  Tr., Vol. 1, at 57-58; see also Pet'r Ex. 8.  His GAF of 45, on April 22, 2004, was "still quite serious."  Tr., Vol. 1, at 60; see also Pet'r Ex. 11.  He opined that

> I believe it's reasonable to conclude, based on the totality
> of the information that I saw that Mr. Boothe's mental
> state would not, would be impaired, would be
> significantly impaired, to sustain the mental operations
> necessary to, especially if it's upon him to independently
> initiate, independently task this, of any moderate or
> beyond complexity, I believe he'd be unable to do that.
> Or would have been.

Tr., Vol. 1, at 63.

On cross-examination, Dr. Martinez admitted that there was no evidence that petitioner was catatonic or severely psychotic.  Id. at 64-65.  Indeed, the only psychotic symptoms he displayed in 2003 were hallucinations.  Id. at 65.  He admitted that requesting medication changes and mental health literature, and completing the attendant paperwork, would be an example of goal-directed action. Id. at 66-67.  Dr. Martinez did not apply the "competent to stand trial" standard to petitioner; he instead considered whether petitioner was able to understand his legal rights, manage his legal affairs, and execute the procedures necessary to exercise those rights.  Id. at 71-72.  He considered this more demanding than the standard for trial competency described in Dusky.  Id. at 72; see also Dusky v.

9

United States, 362 U.S. 402, 402 (1960) (test for trial competency is "whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him.").

Dr. Martinez thought it interesting that none of petitioner's doctors raised the possibility of malingering, because of the relative rarity of visual hallucinations among psychotics and because the medication did not seem to have ever brought his symptoms under control.  Tr., Vol. 1, at 75-76.  He thought that if petitioner was not malingering, these factors indicated that his illness was more severe than his doctors seemed to believe.  Id. at 88.

Dr. Martinez described rational motive therapy, or rational emotive therapy, ("RET"),[4] which trains patients to interpret events appropriately before reacting. Id. at 81-82.  He pointed out that although petitioner claimed to benefit from RET in group therapy sessions, he also claimed to be hearing voices at the same time. Id. at 84.  He did not think the medical records demonstrated that petitioner had actually learned and applied RET at a high-functioning level; instead, the record noted only that petitioner claimed to have done so.  Id. at 138-39.  He thought that

---

[4] RET is a technique whereby patients learn to recognize the link between their thinking and emotions.  Tr., Vol. 1, at 221.

10

petitioner could have been functioning at a higher level during group therapy sessions because of the Pygmalion effect.  Id. at 87.  He noted that this would explain the discrepancies between the relatively positive and negative evaluations of petitioner in the record.  Id. at 89.  However, he admitted that, to some degree, he was merely speculating that petitioner's functioning in group therapy was superior to his functioning at other times.  Id. at 117.  He also admitted not speaking with Mr. Igwilo, Dr. Reading, or anyone at Jester IV in preparing his affidavit.  Id. at 91; see also Pet'r Ex. 3.  He felt that it would not be helpful because of possible "memory contamination."  Tr., Vol. 1, at 92.

On examination by the magistrate judge, Dr. Martinez explained that it is difficult to maintain a facade of insanity over a long period of time, and that he did not believe that petitioner was malingering.  Id. at 120.  He explained that psychiatric diagnoses are never lifted; if a patient is symptom-free for a long period of time the illness is in remission, not cured.  Id. at 121.  Indeed, schizoaffective disorder is caused by a permanent brain disorder.  Id. at 122.  Dr. Martinez observed mental illness can reduce volitional capacity, and could impact petitioner's ability to sustain the effort necessary to file a habeas petition.  Id. at 124-25.  As to the Pygmalion effect, Dr. Martinez explained that it would explain the inconsistencies between the records of petitioner in group therapy and his low

GAF scores in his individual treatment plans.  Id. at 125-26.  However, he admitted
the possibility that petitioner made actual progress over the relevant time period.
Id. at 128.

Dr. Martinez reiterated his opinion that petitioner was not competent to file a
habeas petition in 2003.  Id. at 134.  He did not have an opinion on petitioner's
competency before that time; however, he agreed that the records indicated some
improvement between his arrival at Jester IV in 1997 and 2003.  Id. at 134-35.  He
believed that petitioner's stable but psychotic condition since his incarceration
would not change much, barring the introduction of an effective new medication.
Id. at 136.

## B.    Petitioner Leland Boothe.

Petitioner first briefly recounted his early history of mental illness.  He
recalled that his adoptive mother "tried to beat him to death a couple of times"
around age 14.  Id. at 146.  Petitioner explained his history of suicide; he first
attempted to commit suicide by shooting himself at age seventeen, and tried to
commit suicide five times in 1996.  Id. at 147.  He was diagnosed with bipolar
disorder after his first suicide attempt.  Id.  He testified that voices commanded him
to shoot himself when he was seventeen.  Id. at 151.

Petitioner claimed that he did not remember all of his time at Jester IV, and

that he "lost track of everything" several times after his medication was adjusted. Id. at 148.  He did, however, remember Mr. Igwilo, who administered group therapy and checked up on him occasionally.  Id. at 148-50, 164.  He often told Mr. Igwilo about his hallucinations, which consisted of animals running on the ceiling and voices which sometimes told him to commit violence.  Id. at 150.  While he professed to be unable to control the voices, petitioner described Mr. Igwilo's advice to "change the channel" on his hallucinations and not think about them.  Id. at 152.  The voices were worse when he was alone.  Id.

Petitioner explained that his pharmacological treatment regime, while often changing, included Thorazine and doxepin, both of which have powerful sedative effects.  Id. at 153.  Although he never refused to take his medication, it was accidentally cut off several times.  Id. at 189.  He spent most of his time in Jester IV "knocked out," with no idea of his legal rights.  Id.

When petitioner met Wayne Barker "a year or two" after his transfer to Skyview, he learned that he could file a petition for a writ of habeas corpus.  Id. at 154.  He allowed Mr. Barker, a "writ writer" who charged for his services, to prepare and file papers on his behalf.  Id. at 154-56, 158-160.  Although able to read paperback novels, petitioner did not participate in the research or drafting of his state habeas petition.  Id. at 155-158.  He professed not to know what filing

13

such a petition required.  Id. at 158.  He merely signed whatever Mr. Barker asked

him to.  Id. at 163.  Mr. Barker would get angry with him whenever petitioner's

benefactor was late sending him money.[5]  Id. at 161.  Mr. Barker also wrote a letter

on petitioner's behalf to petitioner's brother asking for money.  Id.; see also Pet'r

Ex. 7.  Petitioner believed that he was going to get out of prison because of his

habeas petition.  Tr., Vol. 1, at 161.

On cross-examination, petitioner explained that he had met with his attorney

twice before that day, once back in the spring and then "one other time

somewhere."  Id. at 166.  Counsel for petitioner clarified that petitioner was

referring to the day before, with which petitioner appeared to concur.  Id.

Petitioner relayed counsel's instructions, which were to "[j]ust try to be honest."

Id. at 167.  He expressed his understanding that he was in prison for killing

Kathleen Mahoney, under whom he had worked as a maintenance man for an

apartment complex.  Id.  In regards to Mr. Barker, petitioner explained

> Well, he asked me questions as he went along on the
> thing....  And then when Barker said that they're going to
> - I can't remember what he said about the - "They're
> going to do something to you because you killed that
> woman.  And I said, "But I didn't kill her."  He said,
> "Well, you've got to put something down in that little

---

[5] Petitioner's benefactor, to whom another inmate introduced him, would send petitioner
twenty-five dollars in exchange for copying twenty-five scriptures and sending them to him.  Id.
at 159; see also Resp't Ex. 1; (D.E. 90, at 11).

> spot right there."  And so I don't know what he put on
> there.

Id. at 168.  However, petitioner admitted to knowing that two of the grounds urged in his petition were an improper threat of capital punishment to induce his plea and his incompetency at the time of trial, but not to understanding what the latter meant.  Id. at 169.  During the course of their relationship as cellmates, he was able to tell Mr. Barker about the events leading up to his guilty plea so that he could complete petitioner's habeas application.  Id. at 173.

After living in a four-man cell for his first several years at Jester IV, petitioner was moved to a two-man cell.  Id. at 174.  He explained that he preferred the two-man cell because it was easier to do "trafficking and trading," i.e., to trade medications for commissary items.  Id. at 175.  This arrangement allowed access to a wider market and a greater opportunity to stockpile goods that other traders wanted on a regular basis.  Id. at 176.

Petitioner recalled smearing feces on himself in 1997 or 1998, "[h]oping to get the goon squad and come get me if they thought they was big enough."  Id. at 177.  However, while at Jester IV, petitioner was allowed to work after attaining Supplemental Security Inmate ("SSI") status.  Id. at 177-78.  According to petitioner, Jester IV had only around "two or three" SSIs at any given time.  Id. at 178.  Working as an SSI made "traffic and trading" easier.  Id.  The guards

repeatedly gave petitioner SSI status because he was honest, clean-cut, and never gave them any trouble.  Id. at 179.

Petitioner explained that a lawyer imprisoned for a DUI conviction at Jester IV had filled out I-60 forms to get legal books on his behalf.  Id. at 180.  He remembered checking out a book on child adoption from the prison library in 2004.  Id.  He did so because, according to him, Texas law guarantees an adoptee two-thirds of the estate.  Id.  He also remembered writing a letter to "Racehorse" Haynes, a Houston attorney, asking him to look into his case.  Id. at 183.

Petitioner claimed that he did not remember reading any self-help book on communication around April 14, 2003, as recorded in Mr. Igwilo's notes, and denied that he had the ability to read any such book.  Id. at 185.  However, he admitted reading "a whole bunch of self-help books," including "Joyce Meyers, Me and My Big Mouth, Battlefield of the Mind."  Id.  These books, along with books about Zen Buddhism, helped him control his short temper.  Id. at 186. Petitioner denied having ever read anything about "the link between drug abuse and mental illness."  Id. at 187.

Although petitioner still heard voices during his testimony at the evidentiary hearing, he was able to answer counsel's questions by concentrating hard.  Id. at 190.  He testified that he was now taking Prolixin, which helped with the voices

16

"more than anything I've been on yet." Id. at 191-92. While at Jester IV, he thought the voices he heard were real. Id. at 193. However, other inmates helped him cope with his symptoms; he, in turn, helped newer inmates. Id. at 194. Petitioner said that he had a lot of friends at Jester IV, and that he used to entertain them with stories. Id. at 187-88. On re-direct, petitioner clarified that he had only been taking Prolixin for thirty days. Id. at 195.

Upon examination by the magistrate judge, petitioner explained that his appointments with Dr. Reading were only for five or ten minutes each time. Id. at 196. Every ninety days, Dr. Reading would meet with petitioner to discuss his medication. Id. at 164. At each visit, he asked petitioner a list of similar questions. Id. at 197. Petitioner's visible tremors made eating difficult sometimes, but he did not know if they affected his ability to think. Id. at 197-98.

Petitioner claimed that his first memory of being in Jester IV was waking in a single cell two or three weeks after his arrival. Id. at 198. At that time, petitioner told the treatment team not to bother with him because he would starve himself to death. Id. However, he was no longer suicidal after taking medication for thirty days or so. Id. at 199. He denied ever seeing anyone for individual therapy. Id. at 202. He described the typical group therapy session, in which Mr. Igwilo gave a talk and asked questions, or showed a video. Id. at 203. He found the therapy

17

sessions useful because they kept him from getting into fights.  Id. at 203-04.  He

clarified that he traded only his doxepin or Benadryl, usually for sodas or soups.

Id.

## C.     Christopher Igwilo.

Mr. Christopher Igwilo is a staff psychotherapist with the University of

Texas Medical Branch.  Id. at 207.  He has a master's degree in clinical psychology

from Texas Southern University.  Id.  Mr. Igwilo testified that he first met

petitioner while conducting group therapy sessions at Jester IV in 2003 or 2004.

Id. at 209.  Petitioner was in chronic care at that time.[6]  Id. at 210.  Mr. Igwilo

explained that anyone acutely psychotic would not be able to participate in group

therapy.  Id. at 218.  Although he described petitioner as "alert and oriented" when

he first met him, id. at 215, he denied having higher expectations for petitioner

than for other inmates, or communicating any such expectations.  Id. at 216.  At

group therapy, Mr. Igwilo found that petitioner behaved appropriately.  Id. at 217.

Counsel for respondent asked Mr. Igwilo about his entries in the medical

record.  On January 13, 2003, Dr. Igwilo had quoted Mr. Boothe as saying "I used

to have negative attitude and suffered severe stress.  But since learning RET I have

---

[6] Chronic care is the "third tier" of treatment at Jester IV, housing healthier patients than the acute or crisis management programs.  Tr., Vol. 1, at 210-11.

improved my coping." Id. at 220.  He remembered petitioner telling the group that RET had been very beneficial for him.  Id. at 221.  Mr. Igwilo also explained that the "Ox4" notation means that a patient is oriented to "himself, to who he is, to the time, to the dates, to the year."  Id.  He agreed that a February 3, 2003 notation describing petitioner as "goal directed" was very typical of petitioner.  Id. at 222. He had never seen petitioner act out in a violent way.  Id. at 225.  Indeed, he reported that petitioner was able to progress in therapy because he understood how to change the way he acted.  Id. at 226.

Mr. Igwilo thought that petitioner's performance at group therapy sessions was probably not significantly different than elsewhere.  Id. at 219.  He did not recall any signs of the Pygmalion effect.  Id.  However, he doubted that petitioner was ever completely symptom-free.  Id. at 227.  Petitioner seemed depressed at times, and reported psychotic symptoms.  Id.  In spite of this, he was able to manage his hygiene, relationships with other inmates, and personal affairs.  Id. at 227-28.  He seemed to enjoy reading, and Mr. Igwilo thought he was capable of writing and following instructions at the time.  Id. at 228-29.

Mr. Igwilo remembered petitioner reporting hallucinating about animals on the ceiling.  Id. at 229.  He stated that Skyview is for more stable patients, who show improved functioning for more than six months.  Id. at 231-32.  He described

petitioner as an articulate inmate, able to get along with others and think rationally, who did very well compared to what was expected.  Id. at 233-34.  Mr. Igwilo again opined that petitioner was competent to pursue his legal rights while at Jester IV.  Id. at 234.

On cross-examination, Mr. Igwilo indicated that there were at least ten inmates in group therapy sessions.  Id. at 237.  He explained that he had worked with petitioner in group therapy for two-hour sessions once each week for over a year.  Id. at 239-40.  He re-iterated that petitioner seemed to be able to prepare legal pleadings.  Id. at 245.  He explained that patients who can maintain hygiene, avoid disciplinary cases, and understand what actions are in their own best interest become eligible for transfer to Skyview.  Id. at 246-47.  He did not remember petitioner ever talking about habeas corpus petitions, id. at 248, and did not know whether it would be unusual for a similar patient to bring an appeal or habeas action.  Id. at 249.  He testified that a GAF of 38 was a low score that definitely indicated severe symptoms.  Id. at 252.

On re-direct, Mr. Igwilo again opined that petitioner was able to read, write, and ask for legal material.  Id. at 255-56.  He had never heard reports of petitioner acting out, and said that petitioner was not "in a knocked out state" when he knew him.  Id. at 256.  On re-cross, Mr. Igwilo explained that he saw petitioner outside

of group therapy sessions while making rounds on the pod.  Id. at 258.  He

admitted that he could not say for a fact that petitioner understood legal concepts.

Id. at 262.  On further re-direct, he explained that his clinical training allowed him

to form a reliable assessment by meeting a patient for one or two hours each week.

Id. at 263.  He also recalled several specific instances where he saw petitioner

outside of group therapy, to evaluate his progress and functional level.  Id. at 265-

67.  On further re-cross, Mr. Igwilo explained that, at group therapy sessions,

petitioner presented an understanding of the self-help books he had read.  Id. at

268.

 In response to the magistrate judge's questions, Mr. Igwilo explained that

"Ox3" and "Ox4" mean the same thing.  Id. at 170.  According to him, a doctor

might stop at three because the patient was oriented and there was no point in

continuing.  Id. at 271.  He confirmed that his one-on-one interactions with

petitioner usually lasted around five minutes.  Id.  He explained that some of his

entries based on one-on-one interaction would not be marked as such, because the

"individual" classification is reserved for office appointments, not cell-side or day

room visits.  Id. at 272.

 Mr. Igwilo explained that he was not part of the diagnostic team that

determined petitioner was suffering from schizoaffective disorder.  Id. at 275.  He

testified that although a patient who suffered from hallucinations might have difficulty functioning, someone like petitioner, who had good coping skills, might not.  Id. at 278.  He indicated that although petitioner's hallucinations might have been more severe at times, they did not seem to interfere with his coping abilities. Id. at 278-79.  He further indicated that although hallucinations could affect a person's ability to think logically, petitioner was always able to report problems and seek resolution.  Id. at 279.  He admitted that it was possible that petitioner was suffering from both avolition,[7] which could interfere with his ability to perform tasks, and from delusional beliefs.  Id. at 280.  However, he never observed or heard that petitioner demonstrated poor hygiene, disorganized thinking, asocial behavior, bizarre symptoms, or loose associations at Jester IV. Id. at 280-82.  He explained that his January 13, 2003 report, in which he identified petitioner as suffering from psychotic thinking, was based solely on petitioner's statements, not on his own observations.  Id. at 282.

Petitioner's GAF scores were assessed as part of his Individualized Treatment Plans ("ITP").  Mr. Igwilo explained that each ITP should have a new GAF analysis and, if appropriate, a new GAF score.  Id. at 282-83.  He explained

---

[7] "Avolition" is the term used in the DSM-IV to describe the general lack of motivation, desire, or persistence characteristic of schizophrenia.  Tr., Vol. 1, at 312.

that a lower GAF score does not necessarily indicate a diminished capacity to present a goal directed process.  Id. at 284-85.  In his affidavit, "able to pursue his legal rights" is used to mean that petitioner was able to show interest in terms of his legal rights, and what he thought they were.  Id. at 285; see also Pet'r Ex. 3.  He explained that prisoners at Jester IV can request books from the law librarian, but cannot actually visit the library.  Tr., Vol. 1, at 285.  He re-iterated that, in his opinion, petitioner was "able to either pursue his legal rights or assist someone in filing a lawsuit on his behalf during 2003."  Id. at 284.

On re-cross, Mr. Igwilo was not able to explain how a prisoner would know which book he or she needed from the law library.  Tr., Vol. 2, at 7.  He admitted that he did not know for certain whether petitioner could complete and file a habeas petition.  Id. at 10-11.  He indicated that there are no classes on filing habeas petitions offered at Jester IV.  Id. at 24.  He also admitted not knowing if petitioner had requested his own reading material, or if another inmate had done it for him.  Id. at 26.  He explained that, in his opinion, an assessment of a patient's condition over time is more useful than a GAF score, which is a clinical assessment of a patient's condition on only one occasion.  Id. at 29-30.

D.    **Dr. William Reading.**

Dr. William Reading supervises the mental hospital in Jester IV.  Id. at 32.

He is a licensed psychiatrist, and his medical degree is from the University of

Texas Health Science Medical School in San Antonio.  Id.  He explained that

psychiatric diagnoses are chronic; a patient's condition may change, but the basic

diagnosis does not.  Id. at 35.  While he did not remember petitioner, based on his

notes, Dr. Reading characterized his treatment program as "maintenance."  Id. at

36-37.  Schizoaffective patients are treated with separate medications for the

psychotic component (hallucinations or delusions) and the affective component

(usually depression).  Id. at 40.  He admitted that "with all the medicines that Mr.

Boothe has been on, just about every side effect known to man are potential [sic]."

Id. at 41.  However, in his opinion, the medical records indicated that petitioner

was not sedated, or suffering from any disturbance in his level of consciousness.

Id. at 46.  While he believed that petitioner was taking his medicines at Jester IV,

he lacked personal knowledge.  Id. at 47.

Dr. Reading explained that schizoaffective disorder does not affect the areas

of the brain in which the ability to read and focus on self-improvement reside.  Id.

at 50-52.  He explained that, in psychiatry, "goal directed" means that a patient is

able to think logically, without going on tangents or following loose associations.

24

Id. at 48-49.  He opined that there was nothing wrong with petitioner's ability to think, learn, remember, or interact with others.  Id. at 53.  He indicated that he would not reconsider such an opinion on learning that petitioner had a GAF score of 38 because the GAF is a measure of the most severe symptoms on a given date. Id. at 54.  He explained that a patient might, for example, have a low GAF score because of suicidal thoughts, but be able to function normally in every other respect.  Id.  He further explained that his own experiments showed a difference of thirty points, on average, between raters for GAF scores between thirty and eighty. Id. at 56-57.  He characterized petitioner as "high level functioning, which means that he's able to function educationally, interpersonally, cognitively in a manner that is not significantly different than people who do not have schizophrenia."  Id. at 58.

On cross-examination, Dr. Reading explained that, as a general matter, Skyview and Jester IV accept patients with the same diagnoses and symptomology; however, Skyview also has dormitories, which require a higher level of functioning than many patients present.  Id. at 71-72.  He testified that there was not necessarily any relationship between psychosis and motivation to accomplish a particular result.  Id. at 88-89.  He explained that "Ox4" means that a patient is oriented to person, place, time, and situation.  Id. at 90.  He admitted, however, that

while he relied on Mr. Igwilo's notes, he never saw petitioner's behavior at group

therapy firsthand.  Id. at 99.  Indeed, he met petitioner for the first time on April

26, 2004.  Id. at 126-27.

On questioning by the magistrate judge, Dr. Reading explained that "Ox3"

does not indicate lower functioning than "Ox4" unless the observer notes that the

patient is not oriented as to situation.  Id. at 115.  He further explained that

prisoners are routinely transferred between Jester IV and Skyview to alleviate

overcrowding, or to reach the ninety percent occupancy requirement for each

facility.  Id. at 116.  He suggested that other tests resulted in more valid measures

of functioning than the GAF.  Id. at 118.  He explained that the GAF score

measures only the severity of a patient's worst symptom, and that a low score does

not necessarily correspond to a loss of functioning in a specific area, including the

ability to work with an attorney, or understand a criminal charge.  Id. at 120-21.

He reiterated his opinion that petitioner was able to pursue his legal rights in 2003.

Id. at 127.

Dr. Reading opined that petitioner would have been capable of completing a

form petition while at Jester IV, if not every day, then certainly on his better days.

Id. at 136.  He also thought he was capable of discovering the form's existence

from other inmates.  Id. at 136-37.  Although the records indicated that petitioner

may have experienced sedative side-effects from his medication, Dr. Reading did not believe that they led to an inability to complete a habeas form for any significant period of time.  Id. at 143-44.  He also testified that while avolition could affect a patient's ability to pursue his legal rights, the record indicated that patient was not so affected.  Id. at 147-48.

### E.    Dr. Roger Saunders.

Dr. Roger Saunders was the final witness.  He had been present for the duration of the trial.  Id. at 171-72.  He received his doctorate in clinical psychology from the University of North Texas.  Id. at 163; see also Pet'r Ex. 6. Dr. Saunders is a licensed forensic psychologist, and has been retained "about equally" by defense and prosecution in criminal cases to perform hundreds of competency and insanity evaluations.  Tr., Vol. 2, at 164-65.  He explained that even officers of the court frequently confuse "insanity" and "competence," and that mental illness is necessary but not sufficient to prove incompetence.  Id. at 166.  To be incompetent, he explained, there must be a causal link between the mental illness and the statutory criteria for incompetence.  Id.  Incompetence occurs "when the impairment secondary to [a defendant's] mental illness impairs [his] ability to either communicate with counsel or to participate and understand the proceedings against [him]."  Id. at 168.

27

Dr. Saunders described how psychosis can render a person incompetent.
Auditory hallucinations can render a defendant incompetent when they are too
distracting for him to participate with court proceedings.  Id. at 167.  However,
patients can learn coping skills to help deal with hallucinations.  Id.  Delusions can
render a person incompetent when they are directly related to the case to the
circumstances of the offense, or when counsel is incorporated into the delusional
belief system.  Id. at 168.  A defendant's ability to compensate for the symptoms is
relevant, id. at 169, and a medicated defendant is much more likely to be
competent.  Id. at 171.

Dr. Saunders found Mr. Igwilo's and Dr. Reading's assessments consistent
with each other, and agreed with them.  Id. at 173.  He felt that, as primary care
providers, they were in the best position to opine on petitioner's competence.  Id. at
173-74.  He pointed to Mr. Igwilo's description of petitioner's "superior group
participation," and Dr. Reading's statements in his affidavit, see Pet'r Ex. 4, as the
most important observations in forming his opinion.  Tr., Vol. 2, at 174-75.

Dr. Saunders explained that a mental health care professional might use
"Ox3" or "Ox4" interchangeably.  Id. at 176-77.  He further explained that the
"Ox" notation, along with the GAF score, are all parts of a mental status
examination, which can vary widely among practitioners.  Id. at 177.  The GAF

score is the least relied-upon axis of the five-axis DSM-IV evaluation method.  Id.
at 178.  He agreed with Dr. Reading that the GAF is not considered highly reliable,
but is used merely as a "ballpark" figure.  Id.  The GAF is not a behavior rating
scale, and there is no direct correlation between a low score and inability to
manage one's affairs.  Id. at 182.  Many insurance companies and government
agencies, however, use them to determine coverage cut-offs; people sometimes
"play games" with the scores to achieve a desired result.  Id. at 179-80.  Only
scores of fifty or below indicate any visible impairment due to mental illness.  Id.
at 180.  He opined that Mr. Igwilo's assessment, formed over time, was a more
reliable indicator of petitioner's mental state.  Id. at 181.  Furthermore, based on
his own experience conducting group therapy sessions, he felt Mr. Igwilo had
enough information to reliably assess petitioner's mental status.  Id. at 182-83.

Dr. Saunders explained that RET is a technique that requires insight,
abstraction, and critical thinking, and that petitioner's ability to use it showed a
relatively high level of functioning.  Id. at 189-90.  Indeed, it would be unethical to
engage in RET with an actively psychotic patient, because it might worsen their
condition.  Id. at 191.  Petitioner's ability to benefit from RET, as demonstrated by
the record, was significant to Dr. Saunders' competence evaluation because it
demonstrated cognitive ability, focus, and rationality, as well as clarity and

coherence.  Id. at 191-92.

Dr. Saunders believed that the record indicated that petitioner was suffering only from residual auditory hallucinations during early 2003.  Id. at 192.  He also believed that petitioner's ability to answer questions during the hearing demonstrated that petitioner had learned to control and tolerate these hallucinations.  Id.  In his opinion, the record did not show mental retardation, neurological impairment, delusional beliefs, poor hygiene, disorganized thinking, asocial behavior, bizarre symptoms, loose associations, paranoia, or peculiar speech in early 2003.  Id. at 194-95.  Indeed, he thought the record showed that petitioner was "largely symptom free, that the medication was working, and that he was functioning at a high level for individuals at the unit."  Id. at 195.  He thought that petitioner could think abstractly and rationally in early 2003.  Id.  He also thought that petitioner had a reasonable understanding of his legal situation, and possessed good communication skills.  Id. at 196.  He took petitioner's ability to help and to receive help from other inmates about dealing with his hallucinations as further evidence that

> he has insight into his illness, which many do not, and
> has the ability to learn to distinguish between what is a
> production of his own mind and what is reality.  That is,
> of course, the goal ... that they can have insight into that
> illness, that they can learn skills to minimize the impact
> of those symptoms and even educate others.  I mean

> that's relatively rare in the folks that we see.  Some will
> never even gain insight into the illness and always
> believe that it's external and build it into a delusional
> belief system and have very little insight, usually say
> they don't need the medication.  So complaints is [sic] a
> major issue with individuals with major schizophrenia or
> bi-polar disorder even.

Id. at 197.  He testified that he would expect petitioner's I.Q. score to have improved since it was tested at 99 in 1997.  Id. at 198-99.  Finally, after viewing petitioner's state habeas application form, he opined that "it would be reasonable to think that he could fill [it] out, either by himself or with some assistance."  Id. at 200.  Based on this, he concluded that petitioner was legally competent during 2003.  Id.

On cross-examination, Dr. Saunders maintained that "how one is trained in the DSM-IV has everything to do with what [a clinician is] going to weigh when they assess a client at a given point and make that number."  Id. at 213.  However, the impressions of Dr. Reading and the other treatment providers, as noted in the record, are not completely subjective because they are applying "some objective criteria."  Id. at 216.  Dr. Saunders thought it possible that petitioner was experiencing symptoms that Mr. Igwilo never saw.  Id. at 218-19.  However, based on the record, he thought that, if he were aware he had a legal right, petitioner had the capacity to educate himself in the law, to generate and file a writ, and to follow

through with it.  Id. at 222-23.

On re-direct, Dr. Saunders explained that the DSM-IV was not intended to measure competence; instead, it serves to assist mental health professionals communicate and understand each other.  Id. at 231.  No legal criteria is associated with the GAF.  Id.

On examination by the magistrate judge, Dr. Saunders recounted his approximately twenty-minute telephone interview with Mr. Igwilo, who confirmed that petitioner was able to participate and assist others in a group, have insight, and reason abstractly.  Id. at 234.  Mr. Igwilo also described petitioner as being in the upper end of functioning, compared to other inmates.  Id.  Dr. Saunders explained that Dr. Reading's assessment was relevant to petitioner's functioning in 2003, even though he first treated him in April of 2004, because it was near in time to the period in question and confirmed that petitioner continued to function beyond 2003.  Id. at 235-36.  However, Dr. Saunders admitted that Dr. Reading must have been relying solely on Mr. Igwilo's notes in assessing petitioner's competence in 2003.  Id. at 238.  Similarly, his interviews with Sergeant Johnson and Officer Brigham, both of whom work at Skyview and only met petitioner after his transfer, contributed to his overall impression of petitioner's illness, but did not relate directly to his competence in 2003.  Id. at 238-41.  He observed that, although

petitioner's GAF score was low, there was ample evidence that he was able to communicate with others and learn about his illness and medications; from this he inferred that he would be able to do the same in the legal realm.  Id. at 243.  He explained that he had focused on the first three months of 2003 in his affidavit because he felt he had enough evidence to form an opinion as to petitioner's competence.  Id. at 248; see also Pet'r Ex. 5.  He admitted that an incompetent person could become competent for three months and then again become incompetent.  Tr., Vol. 2, at 248-49.  However, based on record evidence, his opinion was that petitioner was competent throughout 2003.  Id. at 251.  As to the period before 2003, he thought it likely that he was competent for most of the time because he was being treated.  Id. at 249.  However, he could not point to anything specific that demonstrated his competence.  Id. at 250.

## IV.  LEGAL STANDARDS

**A.    Equitable Tolling Is Available In The Fifth Circuit.**

Pursuant to the AEDPA, a one-year period of limitations applies to an "application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C. § 2244(d)(1).  The statute specifies that the limitations period runs from the latest of the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time

for seeking such review;
(B) the date on which the impediment to filing an
application created by state action in violation of the
Constitution or laws of the United States is removed, if
the applicant was prevented from filing by such State
action;
(C) the date on which the constitutional right asserted
was initially recognized by the Supreme Court, if the
right has been newly recognized by the Supreme Court
and made retroactively applicable to cases on collateral
review; or
(D) the date on which the factual predicate of the claim
or claims presented could have been discovered through
the exercise of due diligence.

Id.

This filing deadline is a statute of limitations, not an inflexible jurisdictional

requirement.  Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998).  The Supreme

Court recently assumed without deciding that equitable tolling is available to

habeas petitioners.  Lawrence v. Florida, __ U.S. __, 127 S. Ct. 1079, 1085 (2007).

The Lawrence Court explained that a petitioner would have to "show '(1) that he

has been pursuing his rights diligently and (2) that some extraordinary

circumstance stood in his way' and prevented timely filing."  Id. (quoting Pace v.

DiGuglielmo, 544 U.S. 408, 418 (2005)).  The Fifth Circuit has held that

"[d]ismissing a habeas petition is a 'particularly serious matter,'" and therefore the

AEDPA limitations period may be "subject to equitable tolling in 'rare and

exceptional circumstances.'"  Prieto v. Quarterman, 456 F.3d 511, 514 (5th Cir.

2006) (quoting <u>Fisher v. Johnson</u>, 174 F.3d 710, 713 (5th Cir. 1999) and <u>Davis</u>, 158 F.3d at 811).  "The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable."  <u>Davis</u>, 158 F.3d at 810 (citation omitted).

Respondent argues that in <u>Bowles v. Russell</u>, the Supreme Court overruled these cases.  (D.E. 101, at 9).[8]  According to respondent, after <u>Bowles</u> all "Congressionally mandated statutory time limits are jurisdictional, and therefore not subject to equitable tolling."  <u>Id.</u> at 9-10.  He argues that <u>Bowles</u> makes it clear that AEDPA's limitations period is jurisdictional; in the alternative, he argues that the language of § 2244(d) shows that Congress did not intend that the limitations period ever be tolled.  <u>Id.</u> at 10, 15.

To the extent respondent argues that every limitations period embodied in a statute is now jurisdictional, he is incorrect.  <u>Bowles</u> merely re-affirms the Court's "longstanding treatment of statutory time limits <u>for taking appeal</u> as jurisdictional." 127 S. Ct. at 2364 (emphasis added).  The Court goes on to apply the settled rule that courts have no power to excuse jurisdictional requirements.  <u>See id.</u> at 2366. While <u>Bowles</u> notes that prior decisions "have also recognized the jurisdictional

---

[8] Respondent made essentially this same argument in his objections to the memorandum and recommendation that recommended an evidentiary hearing.  (D.E. 84, at 1-8).  This Court rejected his argument in adopting the memorandum and recommendation.  (D.E. 85).

significance of the fact that a time limitation is set forth in a statute," id. at 2364, and opines that "[j]urisdictional treatment of statutory time limits makes good sense," id. at 2365, it does not give lower courts any new rule by which to decide whether a given statutory time period is jurisdictional.  See also United States v. Brockamp, 519 U.S. 347, 350 (1997) ("Ordinarily limitations statutes use fairly simple language, which one can often plausibly read as containing an implied 'equitable tolling' exception.").

Similarly, another recent Supreme Court Decision, which respondent characterizes as "refin[ing the Supreme Court's] holding in Bowles with regard to what makes some statutes of limitations jurisdictional," addresses a limitations period that has been considered jurisdictional since the year 1883.  John R. Sand & Gravel Co. v. United States, __ U.S. __, 128 S. Ct. 750, 754 (2008); see also (D.E. 101, at 14).  The John R. Sand Court held that the "the special statute of limitations governing the Court of Federal Claims requires ... *sua sponte* consideration" despite the Government's waiver of the timeliness issue.  128 S. Ct. at 752 (emphasis added).  The Supreme Court further explained that most statutes of limitations are non-jurisdictional; they must be raised as an affirmative defense, and are subject to equitable tolling.  See id. at 753.  These recent decisions discuss the differences between jurisdictional and non-jurisdictional statutes of limitations,

36

but do not invite lower courts to reconsider whether any particular limitations period is jurisdictional.

The Fifth Circuit has interpreted <u>Bowles</u> to stand for the proposition that <u>only</u> statutorily imposed time limits can be jurisdictional.  <u>United States v. Martinez</u>, 496 F.3d 387, 388 (5th Cir. 2007) (per curiam).  The Fifth Circuit has not held or implied that <u>all</u> such limits are now jurisdictional.  Indeed, the Fifth Circuit has long "recognized that the AEDPA's limitations period is not jurisdictional, and is subject to equitable tolling."  <u>Egerton v. Cockrell</u>, 334 F.3d 433, 436 (5th Cir. 2003) (citation omitted).

Furthermore, the Second Circuit has considered whether equitable tolling of AEDPA's limitations period still exists after <u>Bowles</u>.  <u>See</u> <u>Diaz v. Kelly</u>, __ F.3d __, 2008 WL 199846, at *3 (2d Cir. Jan. 25, 2008).  The <u>Diaz</u> court explained that "it would be an unwarranted extension of <u>Bowles</u> to think that the Court was impliedly rendering equitable tolling inapplicable to limitations periods just because they are set forth in statutes."  <u>Id.</u>  The Second Circuit explained that because "a statute of limitations is a defense, *see* Fed. R. Civ. P. 8(c), it has not been regarded as jurisdictional.  <u>Id.</u> (citing <u>Day v. McDonough</u>, 547 U.S. 198, 205 (2006)).  In finding that equitable tolling still was available, the Second Circuit rejected arguments similar to those made by respondent.  Finally, the court read

<u>John R. Sand</u> as supporting the continued availability of equitable tolling, contrary to respondent's view.  <u>Id.</u>

Respondent has argued that equitable tolling is no longer available in other Texas federal courts.  However, it does not appear that any court has accepted this argument.  <u>See</u> <u>Patterson v. Director, TDCJ-CID</u>, No. 6:07cv326, 2007 WL 4368583, at *6 n.2 (E.D. Tex. Dec. 13, 2007) (unpublished) ("Respondent overlooks the fact that <u>Bowles</u> referred to time limits which are *jurisdictional*, such as notices of appeal, and the habeas corpus statute of limitations is not jurisdictional.") (italics in original) (citation omitted); <u>Parker v. Director, TDCJ-CID</u>, No. 9:07cv178, 2007 WL 4268790, at *3 n.1 (E.D. Tex. Nov. 30, 2007) (unpublished) (same).  Similarly, this Court has addressed <u>Bowles</u> and determined that habeas petitioners may still raise arguments that they are entitled to equitable tolling.  <u>See</u> <u>White v. Quarterman</u>, No. H-07-2039, 2007 WL 4223491, at *3-4 (S.D. Tex. Nov. 29, 2007) (unpublished); <u>Williams v. Quarterman</u>, No. H-07-2105, 2007 WL 4223242, at *4-5 (S.D. Tex. Nov. 28, 2007) (unpublished); <u>Curry v. Quarterman</u>, No. H-07-1571, 2007 WL 3341727, at *3-4 (S.D. Tex. Nov. 9, 2007) (unpublished); <u>Barton v. Quarterman</u>, No. H-07-1192, 2007 WL 3328107, at *4-5 (S.D. Tex. Oct. 30, 2007) (unpublished).

Respondent argues that even if § 2244(d) is not jurisdictional, it is still a

strict mandate of Congress that is not subject to equitable tolling.  (D.E. 101, at 15-18).  He likens it to the limitations periods found not subject to equitable tolling in Bowles and Brockamp.  Id. at 16.  However, the statutes differ in important respects.  The statute at issue in Bowles, 28 U.S.C. § 2107(a), explicitly applies the deadline for filing a notice of appeal to all suits "[e]xcept as otherwise provided in this section."  Whereas, the statute at issue in Brockamp, 26 U.S.C. § 6511, restates its limitations period several times, in several different ways that limit a taxpayer's substantive right to recover overpayment.  519 U.S. at 350-52.  Indeed, the Court explains that "Section 6511 sets forth its time limitations in an unusually emphatic form."  Id. at 350 (emphasis added).  Here, § 2244(d)(1) reads simply, "A 1-year period of limitations shall apply to [§ 2254 petitions.]"  The habeas limitation uses "fairly simple language, which one can ... plausibly read as containing an implied 'equitable tolling' exception."  Brockamp, 519 U.S. at 350.

Respondent points to § 2244(d)(1)(B)-(D), which allow the limitations period to begin on dates other than the date the conviction became final, as exemplifying Congressional intent to limit equitable considerations to certain enumerated conditions.  (D.E. 101, at 16).  He refers to these as "concrete tolling provisions" without addressing the difference between beginning the limitations period and lengthening it.  Id.  Although the Seventh Circuit has questioned the

necessity of the equitable tolling doctrine in light of these provisions, see Taliani v. Chrans, 189 F.3d 597, 598 (7th Cir. 1999); see also (D.E. 108, at 16) (citing Taliani), the Fifth Circuit has not.  Indeed, the Seventh Circuit does not prohibit equitable tolling.  Wilson v. Battles, 302 F.3d 745, 748-49 (7th Cir. 2002). Furthermore, the language of § 2244(d)(1) does not indicate an intent to prohibit all unenumerated exceptions.  Accordingly, it is respectfully recommended that equitable tolling is available in the Fifth Circuit.

**B.    Petitioner's Filing Of A State Habeas Application Tolled The Time For Filing His Federal Petition.**

Respondent argues that even if the statute of limitations on petitioner's claims is equitably tolled until the date he filed his state habeas application, the instant petition is untimely.  (D.E. 101, at 7); see also Tr., Vol. 2, at 270.  He asserts that it is "well established that a state habeas petition filed after the expiration of AEDPA's limitations period does not serve to statutorily toll the limitations period under 28 U.S.C. § 2244(d)(2)."  (D.E. 101, at 7).  While true, that rule does not apply here because AEDPA's limitations period could not have expired if it were equitably tolled.  Respondent also appears to argue that when the one-year limitations period in § 2244(d)(1) is equitably tolled, it somehow continues to run with respect to § 2244(d)(2).  Thus, petitioner must file within one calendar year of the date the limitations period begins, even if the limitations

40

period is equitably tolled.  Such an argument is extremely counter-intuitive as it would eviscerate the equitable tolling doctrine that courts have acknowledged is available.  Moreover, respondent has not supported this argument.  Accordingly, it is respectfully recommended that AEDPA's limitations period may be statutorily tolled after a period of equitable tolling.

Respondent further argues that petitioner cannot benefit from equitable tolling at any time after his state habeas petition was filed.  Id. at 7.  Respondent reasons that petitioner's mental illness obviously no longer constituted "exceptional circumstances" after September 30, 2005, the day he actually filed his state habeas petition.  Id.  Respondent further reasons that the requirement that petitioner exhaust his state remedies cannot be an "extraordinary circumstance" that justifies equitable tolling, because he could have filed a "protective" federal petition on the same date and requested it be stayed.  Id. at 8; see also Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005) (explaining that "protective petition" option mitigates harshness of requiring state habeas petitions be timely filed to be "properly filed" for purposes of AEDPA's statutory tolling provision).  Thus, the exhaustion requirement is not an "extraordinary circumstance" sufficient for equitable tolling.  (D.E. 101, at 8).

Respondent argues that the Pace Court "impliedly held that an inmate is *not*

41

entitled to equitable tolling during the pendency of a state habeas application filed

outside of the limitations period, because the pending state habeas petition does not

present an they [sic] type of 'extraordinary circumstance' contemplated by the

court."  (D.E. 101, at 8).  The <u>Pace</u> Court held that a state habeas petition must be

timely filed to be "properly filed," and thereby to toll AEDPA's limitations period

pursuant to 28 U.S.C. § 2244(d)(2).  Arguing for the opposite conclusion,

petitioner pointed out that this rule subjects petitioners to the "predicament" of

"trying in good faith to exhaust state remedies ... for years only to find out at the

end that [the petition] was never properly filed."  544 U.S. at 416.  The Supreme

Court explained that a petitioner unsure whether he was eligible for statutory

tolling could avoid running afoul of AEDPA's limitations period by filing a

"protective" petition, and then requesting the court stay that petition until the

claims were exhausted.  <u>Id.</u> ("A petitioner's reasonable confusion about whether a

state filing would be timely will ordinarily constitute 'good cause' for him to file in

federal court.") (citation omitted); <u>see also</u> <u>Rhines v. Weber</u>, 540 U.S. 269, 278

(2005) ("if the petitioner had good cause for his failure to exhaust, his unexhausted

claims are potentially meritorious, and there is no indication that the petitioner

engaged in intentionally dilatory tactics [then]... the district court should stay,

rather than dismiss, the mixed petition").

The Pace petitioner also argued that he was entitled to equitable tolling for the same period because "state law and Third Circuit exhaustion law created a trap" on which he detrimentally relied.  544 U.S. at 418.  The Court refused to equitably toll the limitations period.  The petitioner's unexhausted claim was filed in state court on November 27, 1996, more than ten years after he filed his first state habeas application.  Id. at 419.  Furthermore, petitioner waited five months after the state court's ruling became final before filing his federal petition.  Id.  The Court did not rule on whether there was any "extraordinary circumstance," explaining instead that "petitioner's lack of diligence precludes equity's operation."  Id.  Thus, the Pace court did not, impliedly or otherwise, hold that a petitioner must file a "protective" petition to fulfill the diligence requirement for equitable tolling.

The Fifth Circuit recently addressed a similar argument from respondent. Howland v. Quarterman, 507 F.3d 840, 846 (5th Cir. 2007) (per curiam).  The petitioner in Howland, whose initial state habeas application was lost in the mail, unsuccessfully argued that it was "filed" pursuant to AEDPA's statutory tolling provision on the date he submitted it to prison officials.  Id. at 843.  In the alternative, he argued that the court should equitably toll the limitations period because the lost petition represented an "extraordinary circumstance."  Id. at 845.

43

The Fifth Circuit found that there were no extraordinary circumstances that would justify equitable tolling.  Id. at 846.  As for diligence, the second requirement for equitable tolling, the Howland court explained that "the Supreme Court has suggested that diligence might require the petitioner to file a 'protective' habeas petition in federal court and to request a stay while he exhausts his state remedies." Id. (quoting Pace, 544 U.S. at 416).  However, because the petitioner had not otherwise established entitlement to equitable tolling, the court "expressly decline[d] to determine whether a protective petition is necessary in this case."  Id.

It is respectfully recommended that, where a petitioner's mental illness is the sole ground for equitable tolling, the tolling period must end when the state petition is filed.  Filing a habeas petition establishes that a petitioner is competent to do so.  Therefore, if a petitioner's mental incompetence is the only extraordinary circumstance on which equitable tolling is predicated, filing a state habeas application establishes that there is no longer any such extraordinary circumstance. In this situation it is AEDPA's statutory period, not equitable tolling, that prevents the petition from being timely filed.

One relevant period remains: the time between the date the state court denied petitioner's state application, March 1, 2006, and the date he filed the instant petition, April 15, 2006.  During this period, petitioner is not eligible for either

statutory or equitable tolling.  Accordingly, it is respectively recommended that the

instant petition is not timely if petitioner had less than forty-five days remaining on

AEDPA's one-year limitations period when he filed his state habeas application.

## C.     Petitioner Must Establish That He Is Entitled To Equitable Tolling.

The Fifth Circuit has held that a habeas petitioner has the ultimate burden of

proving that equitable tolling of the AEDPA's limitations period should apply.

Howland, 507 F.3d at 845.  In addition, the Fifth Circuit has determined that

mental "competency is a question of fact as opposed to a mixed question of law

and fact or a question of law."  United States v. Williams, 819 F.2d 605, 607 (5th

Cir. 1987) (citations omitted).  The Fifth Circuit has not articulated the exact

quantum of proof necessary to show that a habeas petition should be equitably

tolled.[9]  Petitioner argues for the preponderance of evidence standard, (D.E. 102, at

3), and respondent does not address the issue in his brief.

Other federal district courts in Texas have applied the preponderance

standard when considering whether to equitably toll AEDPA's limitations period.

See Hutchinson v. Director, TDCJ-CID, No. 2:05cv178, 2006 WL 1408347, at *1,

5 (E.D. Tex. May 18, 2006) (unpublished); Vineyard v. Dretke, No. 5:01CV173C,

---

[9] The Fifth Circuit has, however, held that the denial of equitable tolling is reviewed for abuse of discretion.  Molo v. Johnson, 207 F.3d 773, 775 (5th Cir. 2000) (citing Fisher, 174 F.3d at 713).  The factual findings supporting such a decision are reviewed for clear error.  Howland, 507 F.3d at 843 (citation omitted).

2005 WL 2219272, at *6 (N.D. Tex. Aug. 5, 2005) (unpublished) (citing <u>United States v. Marshall</u>, 856 F.2d 896, 899 (5th Cir. 1988)).  In <u>Marshall</u>, the Fifth Circuit explained that the party invoking tolling must establish that it is warranted by a perponderance of the evidence.  <u>See</u> 856 F.2d at 899.  Accordingly, it is respectfully recommended that petitioner must prove by a preponderance of the evidence that he is entitled to equitable tolling.

**D.      Standard For Equitable Tolling Due To Mental Illness.**

The Fifth Circuit has determined that equitable tolling is appropriate when "rare and extraordinary" circumstances beyond a habeas petitioner's control prevent a timely-filed petition.  <u>United States v. Wynn</u>, 292 F.3d 226, 230 (5th Cir. 2002); <u>see</u> <u>also</u> <u>Coleman v. Johnson</u>, 184 F.3d 398, 402 (5th Cir. 1999) (per curiam).  "A 'garden variety claim of excusable neglect, does not support equitable tolling.'"  <u>Coleman</u>, 184 F.3d at 402 (citation omitted).  Like all equitable doctrines, equitable tolling is "'not intended for those who sleep on their rights.'"  <u>Fisher</u>, 174 F.3d at 715 (quoting <u>Covey v. Ark. River Co.</u>, 865 F.2d 660, 662 (5th Cir. 1989)).

In <u>Fisher</u>, the Fifth Circuit explained that "equitable tolling does not lend itself to bright-line rules, but we draw on general principles to guide when equitable tolling is appropriate.  <u>We must be cautious not to apply the statute of</u>

limitations too harshly." Id. at 713 (emphasis added). The petitioner in Fisher spent just seventeen days of the AEDPA one-year period of limitations in a psychiatric ward, and still had over six months to complete a federal habeas petition after returning to his usual quarters. See id. at 715. However, he requested that the statute of limitations be tolled for 43 days. Id. at 714. The Fifth Circuit found that "a brief period of incapacity during a one-year statute of limitations, even though rare, does not necessarily warrant equitable tolling." Id. at 715 (emphasis added). Indeed, he had 322 days in which to timely file his petition. Id.

The Fifth Circuit has, however, explained that "mental incompetency might support equitable tolling of a limitation period." Fisher, 174 F.3d at 715 (citation omitted); Smith v. Johnson, 247 F.3d 240, 2001 WL 43520, at *3 (5th Cir. Jan. 3, 2001) (per curiam) (unpublished) ("a prisoner's claim of mental incompetence may support tolling the AEDPA time limit if the mental impairment precluded the prisoner from effectively asserting his legal rights"); see also Calderon v. U.S. Dist. Ct. for the Cent. Dist. of Cal., 163 F.3d 530, 541 (9th Cir. 1998) (en banc) (finding that a "putative habeas petitioner's mental incompetency [is] a condition that is, obviously, an extraordinary circumstance beyond the prisoner's control" and that a threshold showing of mental incompetency was sufficient to toll

AEDPA's statute of limitations); cf. Hood v. Sears Roebuck & Co., 168 F.3d 231, 232 (5th Cir. 1999) (discussing traditional rule that equity tolls a statute of limitations when mental illness "prevents the sufferer from managing his affairs and thus from understanding his legal rights and acting upon them.").

Nonetheless, the Fifth Circuit has yet to equitably toll AEDPA's deadlines because of a petitioner's mental incapacity.  Courts within the Fifth Circuit have denied equitable tolling to petitioners claiming mental incapacity because they do not plead, or adduce facts sufficient to support their claims of incapacity.  See, e.g., Smith, 247 F.3d at *3; Barton, 2007 WL 3228107, at *5 (petitioner failed to allege facts establishing that his mental illness prevented him from timely filing his petition); Heidle v. Dretke, No. 3-04-CV-2627-D, 2005 WL 81716, at *1 (N.D. Tex. Jan. 12, 2005) (unpublished) (denying equitable tolling where petitioner failed to allege or prove that "mental disabilities prevented him from seeking post-conviction review during the AEDPA limitations period."); Hennington v. Johnson, No. 4:00-CV-0292-A, 2001 WL 210405, at *4 (N.D. Tex. Feb. 28, 2001) (unpublished) (finding evidentiary burden unmet by "conclusory" assertions). Courts have also denied equitable tolling where petitioners were plainly able to manage their legal affairs during their alleged incapacity.  See, e.g., White, 2007 WL 4223491, at *3 (petitioner "fails to provide necessary details showing that his

48

mental impairment prevented him from managing his affairs or understanding his legal rights"); Hennington, 2001 WL 210405, at *4 n.9 (observing that petitioner's various lawsuits during the period for which he sought tolling belied any claim that his mental illness prevented him from managing his legal affairs); see also Gaston v. Palmer, 417 F.3d 1030, 1034-35 (9th Cir. 2005) (equitable tolling unwarranted where petitioner was able to file state applications before and after the limitations period); Rowe v. Maine, 324 F. Supp.2d 238, 240-42 (D. Me. 2004) (denying equitable tolling where petitioner's only evidence was 1995 Adjudication of Incapacity and he had filed numerous pro se actions since that adjudication).

Respondent argues that the most appropriate standard to apply to equitable tolling claim is the Rees v. Payton standard for competency to waive collateral review. See 384 U.S. 312 (1966). The Fifth Circuit has set out a three-part test for district courts deciding this issue. Mata v. Johnson, 210 F.3d 324, 328 (5th Cir. 2000) (citing Rumbaugh v. Procunier, 753 F.2d 395, 396 (5th Cir. 1985)). Courts should "determine (1) whether that person suffers from a mental disease, disorder, or defect; (2) whether a mental disease, disorder, or defect prevents that person from understanding his legal position and the options available to him; and (3) whether a mental disease, disorder, or defect prevents that person from making a rational choice among his options." Id. (citing Rumbaugh, 753 F.2d at 398).

Respondent's suggested standard is not appreciably different from the traditional approach to equitably tolling a statute of limitations due to mental illness.  See Hood, 168 F.3d at 232.  Both require the presence of a mental illness that either prevents the sufferer from understanding his legal rights or asserting them.  Whether petitioner has a mental illness is not at issue.  Accordingly, it is respectfully recommended that petitioner must show that his symptoms prevented him from either understanding his legal position and his options, choosing a rational course of legal action, or generating and filing an application for a writ of habeas corpus.

## V.  RECOMMENDATION

### A.    Petitioner's Competency Prior To 2003.

Petitioner contends that he was unable to file his habeas petition until after he arrived at Skyview due to his mental illness.  For the time period prior to 2003, none of respondent's witnesses had any experience with petitioner.  Mr. Igwilo only began counseling him in group therapy in 2003.  He did not offer any opinion about petitioner's competency before 2003.

Dr. Reading did not meet petitioner until April 26, 2004.  Much of his opinion stems from his reliance on Mr. Igwilo's group therapy notes.

Finally, Dr. Saunders based his expert report on the first several months of

50

2003, finding petitioner competent.  He did opine that petitioner was likely

competent prior to 2003 based on the fact that he was being treated.  However, he

could not point to anything to support this opinion.  Accordingly, it is respectfully

recommended that this opinion about petitioner's competency prior to 2003 is not

credible.

Regarding the period prior to 2003, petitioner testified that he had visual and

auditory hallucinations that controlled his waking hours.  Moreover, he testified

that he was taking numerous medications that rendered him incapacitated due to

their powerful sedative effect.  He also smeared his own feces all over his body.

The limited records available prior to 2003 also paint a picture of a person

incapacitated by his mental illness.  For example, on March 18, 1997, petitioner

was referred to Jester IV Unit Crisis Management.  Final Boothe Medical Records

Supplement ("FBMRS") at 287.  At that time, his GAF was noted as 24.  Id. at

288.  A treating physician noted that "[i]t is not known at this time whether he will

benefit from continued inpatient treatment beyond the acute phase of his illness."

Id. at 289.  Similarly, in a psychiatric evaluation dated April 14, 2000, the

examining physician recommended that he stay in the "Chronic Psychotic Disorder

Program of Jester IV for maintaining his ADL's due to the chronicity and the

severity of his psychotic symptoms and his personality disorder."  Additional

Boothe Medical Records at 530 (emphasis added).  Again, in a February 27, 2001

psychiatric evaluation, the physician recommended that he stay in the Chronic

Psychotic Disorder Program of Jester IV "due to the <u>chronicity and severity</u> of his

psychotic symptoms and his personality disorder." <u>Id.</u> at 30 (emphasis added).

Respondent did not present any evidence or testimony concerning

petitioner's competency prior to 2003.  Petitioner's testimony concerning his

competency prior to 2003 was uncontroverted.  It is respectfully recommended that

petitioner met his burden and established that he was incompetent prior to 2003.

## B.  Credibility Of Petitioner's Testimony.

Petitioner's testimony is marked with inconsistencies.  He claims to have

told his brother that the allegations against him were true, Tr., Vol. 1, at 161, but

told the write-writer Mr. Barker that they were not.[10] <u>Id.</u> at 168.  He testified that he

had never read a self-help book on communication, but admitted to having read

"Me and My Big Mouth," a self-help book by Joyce Meyer. <u>Id.</u> at 185.  Although

he claimed to never have read a legal book, <u>id.</u> at 156, he remembered checking out

a book on child adoption law in 2004. <u>Id.</u> at 182.  Petitioner also professed to not

remember meeting his attorney the day before the hearing, casting serious doubt on

---

[10] Petitioner testified that his brother's wife "worked at TDCJ and she knew all about the murder....  So I just said that it was true but I got this Writ of Habeas Corpus...."  Tr., Vol. 1, at 161.  Petitioner reported telling Mr. Barker "I didn't kill her." <u>Id.</u> at 168.

either his ability to remember, or his candor.  <u>Id.</u> at 166.

The record contradicts other portions of his testimony.  He claims to never have refused his medication, <u>id.</u> at 189, but the record indicates that he did on at least one occasion, <u>id.</u> at 189, and improving his medication compliance was a goal of a March 22, 2004 ITP.  FBMRS at 97.  Petitioner also testified that he traded doxepin and Benadryl to other inmates.  Tr., Vol. 1, at 204.  His claim that he spent most of his time at Jester IV "knocked out," <u>id.</u> at 153,[11] is at odds with Mr. Igwilo's testimony that petitioner was not knocked out when he knew him in 2003.  <u>Id.</u> at 256.  Furthermore, petitioner denied ever checking out a copy of the Texas Code of Criminal Procedure, <u>id.</u> at 156, even though records indicate that he checked out the book at Jester IV on December 22, 2004, the same day he checked out a book on child adoption.  (D.E. 90, at 4).[12]

Petitioner borrowed the adoption book to better understand his legal rights.  Specifically, he explained that he had learned that, as an adopted child, he had a right to a portion of his adopted parents' estate.  Tr., Vol. 1, at 182.  This research

---

[11] Petitioner testified that "three doxepin will knock you out for a day and a half."  Tr., Vol. 1, at 153.  The fact that he admitted trading his doxepin weighs against finding that he spent 2003 in a "knocked out" state.

[12] Petitioner did testify that another inmate, a lawyer, completed the form required to check out the book on adoption.  Tr., Vol. 1, at 180.  However, petitioner also testified that he himself completed the form to check out a lawyer directory on the same date.  <u>Id.</u> at 200; <u>see also</u> (D.E. 90, at 8).

and analysis with the assistance of an attorney demonstrates a comprehension of sophisticated legal concepts.

Similarly, petitioner had the wherewithal to contact an attorney to represent him before he ever left the Jester IV Unit.  Id. at 183.  He wrote this letter after talking with an attorney incarcerated at Jester IV and requesting a directory. Moreover, he recieved a legal book for his review.

Furthermore, his testimony describes many examples of logical, goal-directed behavior that reflects an ability to act in his own best interest.  In 2003, he participated effectively in group therapy, learned coping skills, dialogued with doctors about his symptoms and medication, traded pills he did not want, and maintained SSI status.  Accordingly, it is respectfully recommended that petitioner's testimony, considered in isolation, does not show that he lacked the capacity to understand and act upon his rights, to make rational decisions regarding those rights, or to complete and file a habeas petition.

## C.      Significance Of Petitioner's GAF Scores.

Witnesses at the hearing presented credible evidence that the GAF score does not directly correlate with a patient's ability to manage his own affairs. See Tr., Vol. 1, at 284-85 (Mr. Igwilo); Tr., Vol. 2, at 54 (Dr. Reading); Tr., Vol. 2, at 182 (Dr. Saunders).  This evidence is consistent with the DSM-IV, which

explains that "where the individual's symptom severity and level of function are

discordant, the final GAF rating always reflects the words of the two."  DSM-IV at

33.  For example, an individual preoccupied with suicide would have a GAF score

of 20-30, regardless of his ability to function.  Id. at 34.  Therefore, it is

respectfully recommended that GAF scores, without more, are of extremely limited

utility in the equitable tolling inquiry.

     Furthermore, evidence adduced at the hearing casts serious doubt on the

inter-rater reliability of GAF scores.  Dr. Reading testified that, in his experience,

GAF scores differ on an average of 20-30 points among raters.  Tr., Vol. 2, at 256-

57.  Dr. Saunders explained that GAF scores vary widely depending on the rater's

training.  Id. at 213-14.  The record bears this out.  According to Mr. Igwilo, staff

are to re-calculate a patient's GAF for every ITP; they are not to simply use a

previous score.  See Tr., Vol. 1, at 283.  Petitioner's GAF was rated at 24 in

individual treatment plans on four occasions: on October 28, 2002, by a

psychological associate surnamed Snell, FBMRS 87; on March 19, 2003, by C.

Robinson, a music therapist, FBMRS 92; by Henry Vasquez, an occupational

therapist, on April 1, 2003, FBMRS 94; and by S. Laws, occupational therapist, on

June 3, 2003.  FBMRS 95.  Mr. Igwilo rated petitioner's GAF score at 35 on

January 13, 2003.  Id. at 92.  He reviewed the ITP again on March 17, 2003, July

21, 2003, October 14, 2003, and March 1, 2004; he did not change the GAF at any time. Id. at 90; see also Tr., Vol. 1, at 272 (all individual treatment plans should be reviewed every three months; changes, if any, should be indicated).

Petitioner's GAF scores over the same period of time – even when measured two days apart - show an 11-point difference between raters. Alternatively, if each ITP does not contain a fresh GAF score, they do not actually indicate his functioning at that time. Accordingly, it is respectfully recommended that petitioner's GAF scores are not useful in determining whether he is entitled to equitable tolling.

**D.    Credibility Of Mr. Igwilo's Observations.**

Mr. Igwilo was the only witness to have direct contact with Mr. Boothe in 2003. His testimony was based largely on his notes of petitioner's progress. He also explained that the Skyview Unit is for inmates who demonstrate improved stability and functioning for at least six months prior to transfer. Tr., Vol. 1, at 232. Except for petitioner, no witness contradicted his testimony. It is respectfully recommended that Mr. Igwilo, and his notes of petitioner's progress contained in the record, are credible.

**E.     Credibility Of Dr. Martinez's Opinion.**

Dr. Martinez concluded that petitioner was not able to understand his legal rights or manage his legal affairs.  Id. at 71-72.  His opinion was based on his belief that Mr. Igwilo's observations in group therapy did not capture the full extent of petitioner's mental illness.  Dr. Martinez testified that distractions such as conversation can ameliorate the symptoms of an active psychosis.  Tr., Vol. 1, at 42.  He explained that those symptoms often have the greatest impact on patients when they are alone.  Id. at 43.  He also felt that the discrepancy between petitioner's low GAF scores, and Mr. Igwilo's generally positive progress notes, suggested that he was subject to the Pygmalion effect, causing his level of functioning to be assessed at an artificially high level.  Id. at 125-26.

While Dr. Martinez did not find any evidence in the record that petitioner was capable of sustained effort on a complex task, he did not find any firm evidence that he was not.  Id. at 48.  Indeed, Dr. Martinez was forced to admit that he could only speculate as to whether petitioner was actually more impaired outside of his group therapy sessions.  Id. at 117.  He also admitted that petitioner may have made actual progress in group therapy.  Id. at 128.  He acknowledged that there was no evidence in the record that petitioner was severely psychotic in 2003, and that his only symptoms of active psychosis were self-reported

hallucinations.  Id. at 64-65.  He agreed that petitioner exhibited a reasonably high level of functioning in requesting medication changes.  Id. at 84.  Furthermore, Dr. Martinez apparently was not aware of all of the ITPs and their conflicting GAF scores.  His testimony established that he only knew three of petitioner's scores: 38 on January 13, 2003; 24 on April 1, 2003; and 45 in April 2004.  Id. at 60.

GAF scores, considered in isolation, are unreliable indicators of a patient's ability to function.  Because of their unreliability, it is not apparent that petitioner's low GAF scores and positive presentation in group therapy must be reconciled.  Indeed, the two are not necessarily inconsistent if the GAF score is based on symptoms such as suicidal ideation rather than cognitive impairment secondary to psychotic symptoms.  The medical records do not indicate exactly why petitioner was given any GAF score.  The discrepancies could also be due to inter-rater variation, or a failure to actually re-evaluate petitioner's GAF score.  Furthermore, Dr. Martinez's Pygmalion effect hypothesis is unsupported by the record. Accordingly, it is respectfully recommended that petitioner's performance in group therapy establishes that petitioner was competent for much of 2003.

**F.     Credibility Of The Opinions By Mr. Igwilo, Dr. Reading, And Dr. Saunders.**

Mr. Igwilo concluded that petitioner was able to pursue his legal rights while at Jester IV Unit.  Dr. Reading and Dr. Saunders agreed.  Their opinions are well

supported by evidence that petitioner was of average or better intelligence and able to read, think rationally, solve problems, and communicate with others.  While Dr. Martinez testified that the record does not demonstrate that petitioner was capable of completing complex tasks, Tr., Vol. 1, at 48, petitioner bears the burden of demonstrating that he is <u>not</u> competent.

It is respectfully recommended that Dr. Saunders' opinion that "[t]here is no data to suggest Mr. Boothe's significant abilities to assist himself personally and medically would not have extended to his legal functioning," is credible.  (D.E. 88, at 8).  Accordingly, it is respectfully recommended that petitioner's mental illness did not preclude him from appreciating his legal position, making a rational choice from his legal options, or completing and filing a habeas petition in 2003.

Pursuant to the proposed finding of fact that petitioner was able to file a habeas petition in 2003, it is respectfully recommended that petitioner has not shown extraordinary circumstances that would warrant equitable tolling of AEDPA's one year limitations period.  Moreover, it is respectfully recommended that the testimony by all of the witnesses establishes that by early 2004 – over one year before he filed his state habeas application – petitioner was able to file a habeas petition.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Fifth Circuit from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although petitioner has not yet filed a notice of appeal, it is respectfully recommended that this Court nonetheless address whether he would be entitled to a certificate of appealability.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may sua sponte rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court.  Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability "may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  To warrant a grant of the certificate as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims

60

debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). This standard requires a § 2254 petitioner to demonstrate that reasonable jurists could debate whether the motion should have been resolved differently, or that the issues presented deserved encouragement to proceed further. <u>United States v. Jones</u>, 287 F.3d 325, 329 (5th Cir. 2002) (relying upon <u>Slack</u>, 529 U.S. at 483). The Fifth Circuit has explained that "[a]ny doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination." <u>ShisInday v. Quarterman</u>, 511 F.3d 514, 520 (5th Cir. 2007) (citing <u>Fuller v. Johnson</u>, 114 F.3d 491, 495 (5th Cir. 1997).

As to claims district courts reject solely on procedural grounds, a petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right <u>and</u> that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Slack</u>, 529 U.S. at 484 (emphasis added); <u>see also</u> <u>Hall v. Cain</u>, 216 F.3d 518, 521 (5th Cir. 2000) (per curiam) (denying COA after reviewing federal petition and determining that jurists of reason would not find debatable whether petition states claim for denial of constitutional right).

Because of the lack of Fifth Circuit precedent on the law of equitable tolling, and on the issue of competence to file a petition for habeas corpus, it is respectfully

recommended that reasonable jurists could debate whether petitioner is entitled to equitable tolling.  Furthermore, petitioner alleges that he was "in a drug induced fog of incomprehension throughout the plea-processing event."  (D.E. 1, at 4).  If true, this claim could merit habeas relief.  See Mata, 210 F.3d at 329 n.2 (standard for competency to plead guilty is "whether the defendant has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and a 'rational as well as factual understanding of the proceedings against him'") (quoting Godinez v. Moran, 509 U.S. 389, 396 (1993)).  Thus, it is respectfully recommended that the instant petition states a valid claim for the denial of a constitutional right.  Miller-El, 537 U.S. at 327 (citing Slack, 529 U.S. at 484); see also Smith v. Dretke, 422 F.3d 269, 273 (5th Cir. 2005) ("At the COA stage, we do not apply the deferential AEDPA standard of review to examine the merits of the habeas petition.") (citing Miller-El, 537 U.S. at 342); Lambright v. Stewart, 220 F.3d 1022, 1026-27 & n.5 (9th Cir. 2000) (COA should issue where procedural ruling is debatable if petitioner "has facially alleged the denial of a constitutional right" because "all of the inferences that govern a Rule 12(b)(6) motion apply").  Accordingly, it is respectfully recommended that petitioner be granted a certificate of appealability.

## VII.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that petitioner is not entitled to equitable tolling, and that his petition for a writ of habeas corpus be dismissed.  Furthermore, it is respectfully recommended that petitioner be granted a certificate of appealability.

Respectfully submitted this 27th day of February 2008.

BRIAN  L. OWSLEY
UNITED STATES MAGISTRATE JUDGE

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **TEN (10) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure; Rule 8(b) of the Rules Governing § 2254 Cases; 28 U.S.C. § 636(b)(1)(C); and Article IV, General Order no. 2002-13; United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except on grounds of *plain error*, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).